(No. 34518.—

*In re* THOMAS HART FISHER, Attorney, Respondent.

*Opinion filed September 18, 1958—Rehearing denied Nov. 26, 1958.*

CHARLES LEVITON, of Chicago, *amicus curiae*.

WILLIAM C. WINES, of Chicago, for respondent.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This is a disciplinary proceeding against Thomas Hart Fisher, an attorney, pursuant to the provisions of Rule 59. The Committee on Inquiry of the Chicago Bar Association filed a complaint charging him with obtaining from his client written assignments of alimony, child support and suit fees containing powers of attorney, and filing subsequent petitions for increases in alimony without disclosing the existence of the assignments. He is further charged with seeking to obtain alimony and child support payments for his own use, and obtaining such payments in August and October, 1945.

The complaint also charges that respondent repudiated an agreement made by him and his client before Judge Lewe, by filing petitions for increased payments and thereby breaching his professional duty of good faith and candid and honorable dealing toward the courts.

He is accused of launching a campaign of litigation against his client's husband for the purpose of enforcing his purported rights under these assignments by filing an action in the United States District Court reopening the husband's bankruptcy estate, and a fraud action in the circuit court of Lake County concerning title to real estate; and allegedly representing a fraudulent administrator in the probate court of Cook County. It is alleged that each of the foregoing acts violates respondent's ethical and professional duty as a member of the bar and tends to defeat the administration of justice and bring the courts and the legal profession into disrepute.

Respondent filed an answer to the complaint, and hearings were conducted before the Committee on Grievances of the Chicago Bar Association sitting as commissioners of this court. The matter is brought here on the report of the committee, together with its findings of fact and recommendations. The committee recommended that respondent be suspended from the practice of law for one year, but

the Board of Managers, as commissioners, altered the recommendation to suspension for a period of five years.

Although complex and difficult to fit into chronological sequence, the facts are not in dispute. It is the interpretation to be given such facts that raises the issues.

Respondent was admitted to the practice of law in Illinois in 1922. For a period of about ten years he practiced as a partner in a firm in which his father and brother were members. Since that time he has practiced individually and with associates, engaging in local, interstate and international practice. From January, 1938, until December, 1946, he represented Charlotte Case Joslyn in her separate maintenance and divorce actions against her husband, George R. Joslyn. It is stated that this is the only contested divorce action in which he has engaged. From May, 1944, to July, 1955, he represented the Order of Elks against the bankruptcy estate of George R. Joslyn before the United States District Court for the Northern District of Illinois. From September, 1939, to about May, 1946, he acted as attorney in a fraud action between Mr. and Mrs. Joslyn concerning the title to their real estate. A review of all this litigation finds the respondent weaving and threading his way across the pages of two reported cases in the United States District Court, five appeals to the United States Court of Appeals, at least three appeals to the Illinois Appellate Court, and two appeals to this court, all of which would furnish a contemporary counterpart to Jarndyce v. Jarndyce. (Bleak House, by Charles Dickens.)

Mr. and Mrs. Joslyn were married in 1928 and of this marriage four children were born. Encountering marital difficulties, they entered into a separation agreement providing for the support of Mrs. Joslyn and the four children and making disposition of their home in Lake Bluff. In September, 1938, respondent filed a separate maintenance action on behalf of Mrs. Joslyn in the superior court of Cook County. Apparently this suit was discontinued when

he filed an action for divorce for Mrs. Joslyn in August of 1939. The complaint for divorce charged Mr. Joslyn with desertion. He answered and filed a counterclaim charging her with adultery. In September, 1939, the divorce court entered an order *pendente lite* requiring Mr. Joslyn to pay Mrs. Joslyn as temporary alimony and child support the sum of $750 per month until further order of the court. Trial of the divorce action was commenced before Judge John C. Lewe on June 14, 1940, and continued intermittently throughout the summer of 1940. On August 12, 1940, while the divorce action was pending, respondent obtained a written assignment from Mrs. Joslyn, providing, in part:

"I, Charlotte C. Joslyn, * * * do hereby irrevocably constitute and appoint Thomas Hart Fisher, * * * my * * * attorney coupled with an interest * * * to demand, receive, sue for, and collect all claims * * * due to me from George R. Joslyn on account of any alimony payments, * * * solicitor's fees and suit moneys pursuant to any order or orders heretofore or hereafter entered * * * including * * * all payments for $750 per month due me for the months of August, September, and October, 1940; * * *.

"Upon the non-payment of any such debt, money or demand whatsoever, I do hereby authorize and direct my said attorney to begin, conduct and prosecute any action, * * * for recovering and compelling the payment thereof. * * *

"I do hereby assign * * * all right, title, claim or interest * * * in or to any moneys now due * * * me pursuant to any order for alimony, suit money and solicitors' fees pursuant to any order heretofore and hereafter entered in said proceeding * * *."

The foregoing assignment will be considered in connection with later assignments hereinafter referred to.

On September 30, 1940, after hearing evidence in the divorce action, Judge Lewe called Mr. and Mrs. Joslyn into chambers to discuss the possibility of settlement. The litigants were in apparent agreement that a decree for divorce in favor of Mrs. Joslyn on the grounds of desertion, granting her $100 per month alimony and $400 per month for

the support of the children and making provision for the custody of the children, would be satisfactory, although respondent indicated that he did not consider his client bound.

A decree for divorce was entered on October 1, 1940. It provided $100 per month alimony for Mrs. Joslyn and $400 per month for child support. Thirty eight days later, on November 8, 1940, respondent filed a petition on behalf of Mrs. Joslyn to increase the alimony and child support payments from the $500 per month provided in the decree to a sum not less than $1,500 per month. This petition asserted, among other things, that Mr. Joslyn was the beneficiary of two trust funds created by his mother and father which provided him with an income of $33,750 per year and that the allowance of $500 per month was inadequate in view of Mr. Joslyn's means and station in life. On November 26, 1940, the court denied this petition and no appeal was taken therefrom. However, on December 28, 1940, respondent initiated an appeal for Mrs. Joslyn from the alimony and child support provisions of the decree for divorce. The Appellate Court decision (*Joslyn v. Joslyn,* 315 Ill. App. 160,) affirming the trial court's decree, painstakingly recites the evidence in connection with the agreement between Mr. and Mrs. Joslyn in Judge Lewe's chambers, and respondent's subsequent statements to the court with regard to such agreement, and concludes that the parties had agreed on the amount of alimony and child support and that respondent, by his actions, statements and conduct, had acquiesced therein.

We believe it appropriate at this point to pass upon respondent's conduct, other than in connection with the first assignment, on the day of the divorce proceeding before Judge Lewe. He declined to settle the issues concerning his attorney fees and expenses on the basis that he did not want it said that he had settled his client's case in order

to get attorney fees and that to provide for attorney fees in the decree for divorce would invalidate the decree. He had been paid the sum of $1,000 and Mr. Joslyn was willing to pay him an additional $1,500 in full settlement of his attorney fees. He did not object to this offer nor otherwise indicate to the court that such amount was inadequate but agreed to a provision in the decree that, in determining what fees should be paid, the court should consider the matter as though the issues upon the counterclaim had been determined in favor of Mr. Joslyn. The record also shows that, whatever may have been his motive for so doing, the respondent did tell the court, when the litigants returned from Judge Lewe's chambers, that he could not agree that Mrs. Joslyn could not claim any more alimony at any time nor that she would be bound by the amounts set forth in the decree. He advised the court that the plaintiff must be left in the position in which she found herself after the court entered the decree, and that the provision for alimony was not done by agreement but would have to be done on the court's own responsibility.

We do not find that respondent agreed to abide by the terms of the decree, consequently, neither the filing of an appeal nor the petitions for increases in alimony and attorneys fees constituted a repudiation of any agreement made before Judge Lewe. His statements left the door open to a later petition for an increase in support for Mrs. Joslyn and for attorney's fees and expenses. On the same day that respondent filed the first petition for increase in alimony and support in behalf of Mrs. Joslyn, he also filed a separate petition, consisting of 44 pages and 561 items, claiming $19,770 attorney fees, $730.31 for cash disbursements and $3,690.85 for unpaid expenses. This petition was referred to the master in chancery but, for reasons appearing later, the master's report was not submitted to the trial court until April 22, 1947.

On April 8, 1941, while the appeal from the decree for divorce was pending, respondent obtained a second assignment from Mrs. Joslyn, providing in part:

"I, Charlotte C. Joslyn, * * * assign * * * all right, title, claim or interest * * * to any moneys now due and payable * * * to me for suit moneys, solicitors' fees and alimony over the sum of $100 per month pursuant to any order heretofore or hereafter entered in * * * [Joslyn v. Joslyn,] provided, however, that the foregoing assignment shall not be deemed to require the undersigned or George R. Joslyn * * * to pay to the assignee hereunder any moneys payable to the undersigned for the support * * * of the four minor children * * *.

"And I, the undersigned, do hereby irrevocably constitute and appoint Thomas Hart Fisher my true and lawful attorney in fact for me and in my name to demand, receive, sue for, and collect all claims, debts, moneys and demands * * * due to me * * * in the foregoing assignment, * * * the power herein given my said attorney shall be deemed to be coupled with the interest herein given.

"Upon the non-payment of any such debt, money, or demand whatsoever, I do hereby authorize my said attorney to begin, conduct and prosecute any action * * * for recovering and compelling the payment thereof. And I do further authorize and direct my said attorney * * * to adjust, arbitrate and settle any such claim, debt, money or demand whatsoever and any action, suit or proceedings in respect thereto."

On April 8, 1941, he obtained a third assignment and power of attorney coupled with an interest from Mrs. Joslyn, similar in import to the assignment last above, assigning to respondent all her rights in her home in Lake Bluff, and all her rights, except that which pertained to child support, under the property settlement entered into between her and Mr. Joslyn. Contemporaneously with the two assignments dated April 8, 1941, she signed and delivered a letter addressed to respondent in which she commended him for his previous services, asserted her reliance on his talents, and recited that the two assignments dated April 8, 1941, were to be effective only if certain legal proceedings conducted pursuant thereto were successful and that said assignments were to be effective up to such time

as respondent had been reimbursed for his fees, expenses and advances incurred in her affairs.

The appeal from the decree of divorce (*Joslyn v. Joslyn,* 315 Ill. App. 160) was decided in June, 1942. On October 1, 1942, respondent filed another petition for Mrs. Joslyn setting forth, among other things, that since the entry of the decree for divorce, she had expended money in excess of child support, had incurred extra liabilities, and because of the rise in cost of living it was necessary to modify the decree by increasing her allowances. An order was entered December 16, 1942, increasing her alimony and support payments to $1,000 per month for a three-year period but granting to Mr. Joslyn the election to discontinue the increased payments and revert to the $500 per month as provided in the original decree for divorce. This order further provided that Mrs. Joslyn was to set aside sufficient money to pay income taxes and to apply all money in excess of $500 to the liquidation of her debts.

In January, 1944, respondent filed a third petition for increase in alimony and child support payments, similar to the other petitions, but reciting that Mr. Joslyn had paid Mrs. Joslyn the increased amount of $1,000 per month for only a period of five months and thereafter had reduced the payments to $500 per month. On March 16, 1944, the trial court entered an order again increasing the payments to $1,000 per month but provided that Mr. Joslyn was to apply the additional $500 per month to pay Mrs. Joslyn's creditors, and when such creditors had been paid Mr. Joslyn could reduce the payments $500 per month.

In February, 1946, respondent filed a fourth petition for Mrs. Joslyn to increase the support payments. This petition recited that during the period from February, 1938, to January, 1946, she had received an average of $8,487.25 per year but that this was insufficient to meet her needs and expenditures. It reasserted Mr. Joslyn's benefits under the trust created by his parents, that he was entitled to receive

some $40,000 per year income therefrom, averred that Mrs. Joslyn was entitled to an equitable lien upon the trust income and asked for an increase in support payments reasonably necessary to pay her support and expenses. The petition also prayed that the trustees of the trust and trust depository bank be made parties defendant and that Mrs. Joslyn be entitled to an equitable lien upon Mr. Joslyn's trust income. The disposition of this petition is not shown, probably for the reason that on December 14, 1946, Mrs. Joslyn dismissed respondent and hired other counsel to represent her. Her petition to change counsel recited that respondent could continue to act for her in her petititon for suit money. This the respondent proceeded to do.

On December 17, 1946, respondent filed an answer to Mrs. Joslyn's petition to substitute attorneys and a cross petition claiming his fees and expenses. For the first time, he disclosed the existence of the assignments and powers of attorney obtained from Mrs. Joslyn on August 12, 1940, and April 8, 1941, when he attached copies to the cross petition. His statement for services, dated July 1, 1946, was for a total sum of $60,885, which included his original claim for fees filed on November 8, 1940, but which had not been passed upon. The master, to whom the petition for fees was referred, denied his petition because "by his actions, his false statements, and his conduct, unbecoming a lawyer" he was guilty of unclean hands and not entitled to relief. The trial judge to whom the master's report was submitted found that the conduct of respondent was censurable but nevertheless entered an order allowing him the sum of $6,500, but deducted therefrom the sum of $2,000 and taxed one half the court costs against him. Respondent appealed from this order but attacked only the part of the order taxing costs. The Appellate Court, in a decision concisely setting forth the facts, severely criticized respondent for flagrantly abusing court processes primarily for his own

interests, denied him any fees, and taxed the costs again him. *Joslyn* v. *Joslyn*, 337 Ill. App. 443.

Respondent is accused of launching a campaign of litigation against George R. Joslyn by reopening the Joslyn bankruptcy, by the proceeding to recover the Lake Bluff property for Mrs. Joslyn, and by respondent's representation of a false administrator of the Radzuk estate and the action by the administrator against the employees trust fund of the Joslyn Manufacturing and Supply Company. It is alleged that respondent initiated these proceedings for the purpose of forcing a settlement from Mr. Joslyn which would enable the respondent to enforce his purported rights under the aforementioned assignments. The specification concerning the administration of the Radzuk estate and the action against the trust fund was dismissed for lack of proof. It is not clear from the report or the findings and recommendations what conclusions are drawn from the facts concerning respondent's connection with the Lake Bluff property litigation. However, with reference to the bankruptcy litigation, the committee found that respondent's conduct was contrary to public policy which condemns barratry, maintenance and champerty; and that he attempted to use the bankruptcy proceeding as a means of making George R. Joslyn pay him fees which he had been unable to procure in the State courts.

No useful purpose can be served by our attempt to recite the facts in connection with the primary bankruptcy matter or the many summary and plenary proceedings related thereto. We think that case has received ample attention in the Federal courts. (*Young* v. *First National Bank*, (N.D. Ill. 1949) 85 F. Supp. 68; *In re Joslyn*, (N.D. Ill. 1951) 102 F. Supp. 521; *In re Joslyn's Estate,—Fisher* v. *Young*, (7th Cir. 1948) 168 F.2d 803; *In re Joslyn's Estate*, (7th Cir. 1948) 171 F.2d 159; *In re Fisher*, (7th Cir. 1950) 179 F.2d 361; *In re Joslyn*, (7th Cir. 1952), 198

F.2d 673; *In re Joslyn's Estate,—Fisher* v. *Joslyn* (7th Cir. 1955) 223 F.2d 184.) Similarly, the Lake Bluff case has had its share of attention in our State courts. (*Joslyn* v. *Joslyn,* 380 Ill. 181; *Joslyn* v. *Joslyn,* 318 Ill. App. 643; *Joslyn* v. *Joslyn,* 386 Ill. 387; *Clarke* v. *Chicago Title and Trust Co.* 393 Ill. 419.) The courts before whom these matters were presented did not treat them as barratrous or champertous but accorded to them due consideration. Both proceedings appear to have resulted in some measure of success for respondent's client.

Furthermore, we have considered the disciplinary proceedings brought against the respondent in the United States District Court for the Northern District of Illinois on charges similar to those here presented. Respondent's appeal from suspension for three years resulted in a reversal by the Court of Appeals for the Seventh Circuit. (*In re Fisher,* 179 F.2d 361.) As we recently indicated (*In re Teitelbaum,* 13 Ill.2d 586), disciplinary actions against attorneys practicing before the Illinois courts are our responsibility but the views of the Federal courts are entitled to great weight. This is especially true where the charges arise out of Federal litigation. This record does not contain the clear and satisfactory proof necessary to sustain the committee's conclusion that respondent's connection with these two cases proves him guilty of barratry, maintenance and champerty.

We next consider the charge that the filing of petitions for increase in alimony and support for Mrs. Joslyn, while having in his possession the undisclosed assignments, shows that he sought to obtain for his own use the money decreed for alimony. The committee concludes he was furtively seeking to establish a basis for attacking the decree; that he had a deliberate plan to enrich himself unjustly at the expense of the parties to the case and that this is sufficient basis to suspend respondent from the practice of law for a period of five years.

We think the evidence is sufficient to show that his failure to make candid and forthright disclosure of the existence of the assignments to the court alone subjects him to criticism and censure, but not the severe penalty of suspension.

While the four petitions to increase alimony and child support were extremely vexatious to Mr. Joslyn, they were partially successful. They were executed by Mrs. Joslyn, were presented in her behalf, and she received some benefits thereby. It is true that the respondent had the assignments in his possession during the period of time the petitions were prepared and presented but there is no proof in this record that the petitions were filed to obtain the money for the respondent or that he ever actually obtained money directly therefrom. Respondent did receive $5,230 from Mrs. Joslyn from moneys later released for her benefit by the district court in the Joslyn bankruptcy. But since there is no proof to the contrary, we must accept the evidence as we find it in this record to the effect that he had advanced such sum to Mrs. Joslyn and was lawfully entitled to be repaid therefor. Except for the sum of $5,230 and $1,000 paid to him by Mr. Joslyn during the pendency of the divorce action, the record does not show that he was paid any money for his legal services. Neither do we find any proof to substantiate the charge that in August and October, 1945, respondent obtained alimony and child support payments for his own use.

While it may have been, although we do not so decide by this opinion, that his claim for fees, advances and expenses was exorbitant under the circumstances, he had the undoubted right to properly present his claim to the court. This was done and the matter has been properly adjudicated. (*Joslyn* v. *Joslyn*, 337 Ill. App. 443.) Alimony and child support are continuing obligations subject to change as the conditions and circumstances of the parties may warrant. Mrs. Joslyn had the right to petition for such

increases just as Mr. Joslyn had the right to petition for a reduction thereof, where their changed conditions and circumstances might dictate such action. Having such rights, it became the duty of their respective attorneys to properly represent them in such matters.

One of the principal contentions of *amicus curiae* is that the assignments dated August 12, 1940, and April 8, 1941, are unprofessional, show moral turpitude, are contrary to public policy, and are contrary to good conscience; that they tend to stir up litigation, discourage reconciliation and purport to employ respondent in perpetuity.

Alimony is that allowance which is made to a woman, in a decree of divorce, for her support out of the estate of a husband. It is the equivalent of the obligation implied in every marriage contract that the husband shall furnish his wife a suitable support and maintenance. (*Adams* v. *Storey*, 135 Ill. 448.) It is not a means for penalizing the husband but is established according to the respective rights of the parties litigant pursuant to the peculiar facts and circumstances of each case. (*Byerly* v. *Byerly*, 363 Ill. 517.) A decree of divorce not only concerns the parties litigant but affects the public morals and domestic relations of the people. The public has an interest therein, not only in maintaining the integrity and permanency of the marriage relation (*Ollman* v. *Ollman*, 396 Ill. 176), but also in the maintenance of the social obligations arising therefrom. An award of alimony is a continuation of those obligations in which the public, through the services of its courts, not only maintains an interest but which it graces with its protection. *Welty* v. *Welty*, 195 Ill. 335.

The instruments in question purport to assign to the respondent all alimony to which his client might be entitled, and irrevocably authorize him to act as her attorney to demand, receive, sue for and collect all such money then or thereafter due her for alimony. It would be difficult to devise a more conclusive or efficient means of frustrating

the purpose of alimony or negate the labors of a court in granting an award of alimony. While this precise question has not heretofore been presented to us, we did, in the case of *People ex rel. Healy* v. *Barrios,* 237 Ill. 527, condemn an agreement between an attorney and his divorce client whereby he was to receive as payment for his attorney fees all moneys collected from her husband as alimony or otherwise and disbarred the attorney for his subsequent misconduct based on such an agreement. However, in the *Barrios case* the attorney was condemned primarily for his misuse of moneys collected for his client rather than the taking of an agreement.

Courts of other jurisdictions have been practically unanimous in condemning contingent fee contracts in divorce actions as contrary to public policy. (See Anno. 30 A.L.R. 188; 5 Am. Jur. p. 361.) As in the early leading case of *Jordan* v. *Westerman,* 62 Mich. 170, 28 N.W. 826, most courts have based their holdings upon the premise that assignments of alimony tend to deter or prevent reconciliation between husband wife. (See also *In re Smith,* (Wash. 1953) 254 P.2d 464; *State* v. *Dunker,* (1955) 160 Neb. 779, 71 N.W.2d 502; *Baskerville* v. *Baskerville,* (1956) 246 Minn. 496, 75 N.W.2d 762; *Welles* v. *Brown,* (1924) 226 Mich. 657, 198 N.W. 180.) We conclude that it is against sound public policy for attorneys to take assignments of alimony or enter into contingent fee contracts in divorce actions. To hold otherwise would tend to encourage divorce rather than reconciliation of estranged couples.

We are faced with the question of whether the foregoing rule should be applied to this case. Respondent contends, and we think rightfully, that our holding should not be applied retroactively. He cites the cases of *Dietz* v. *Speybroeck,* 225 Ill. App. 133, *Rasmussen* v. *Rasmussen,* 334 Ill. App. 308, and *Dickerman* v. *Jones,* 328 Ill. App. 131, each of which dealt with contingent contracts in divorce cases. Even though the policy question was neither raised

nor passed upon in any of those cases, respondent could have relied upon them. The foregoing Appellate Court decisions shall not hereafter be regarded as precedents on this point, but the taking of the assignments in question will not be used as the basis for any disciplinary action in this case. Cf. *In re Luster,* 12 Ill.2d 25.

Considerations which move and guide us in this type of case are well summarized in the case of *In re Donaghy,* 402 Ill. 120, at page 123:

"The legal calling is a time-honored profession and the courts owe a duty to protect the public from impositions and improper practices. This duty has repeatedly been declared by this court. (*People ex rel. Chicago Bar Ass'n* v. *Lotterman,* 353 Ill. 399; *People ex rel. Chicago Bar Ass'n* v. *Green,* 353 Ill. 638; *People ex rel. Chicago Bar Ass'n* v. *Hansen,* 316 Ill. 502.) Such duty, and the manner in which it is exercised, must not be despotic, but the charges must be sustained by clear and convincing proof and the misconduct must be shown to have been fraudulent and the result of improper motives, and the proof must show intent. (*In re Smith,* 365 Ill. 11.) The courts must not exercise their supervisory control in an arbitrary manner, but must show a legal discretion in the exercise thereof. *In re Lasecki,* 358 Ill. 69.

"The disbarment of an attorney is the destruction of his professional life, his character, and his livelihood. (*People ex rel. Chicago Bar Ass'n* v. *Mall,* 354 Ill. 323; *In re Lasecki,* 358 Ill. 69; *In re Dunn,* 370 Ill. 413.) The court should, therefore, disbar in moderation. (*People ex rel. Chicago Bar Ass'n* v. *A'Brunswick,* 315 Ill. 442.) Likewise the same considerations obtain in the application of a three-year suspension rule. A removal of an attorney from practice for a period of years entails the complete loss of a clientele with its consequent uphill road of patient waiting to again re-establish himself in the eyes of the public,

in the good graces of the courts and his fellow lawyers. In the meantime, his income and livelihood have ceased to exist. The courts, however, should not hesitate to inflict the penalty where the punishment is fully deserved."

Here we have a lawyer who took from his client instruments which would, if improperly asserted, have been grossly unfair not only to his client but to the courts from whom his client sought relief. As an officer of the court he is required to shun even the appearance of a fraudulent design or purpose. (*In re Alschuler,* 388 Ill. 492.) By failing to disclose the existence of the assignments to the court while seeking additional support money in which he had an interest, he created the very condition he should have avoided. Moreover, the record is replete with instances of his vacillation and equivocation in situations demanding his utmost candor and loyalty to the courts before whom he practiced. His redemption in this regard is that the record shows that he was zealously, perhaps over zealously, presenting matters ostensibly in behalf of his client, some of which ultimately resulted in her benefit.

While we feel the commissioners' recommendation of suspension from the practice of law for five years may be too harsh, it should, by no means, be inferred that we approve of respondent's acts and conduct as a lawyer. His failure to apprise the court of the assignments until he was forced to do so in answering his client's petition for a substitution of attorneys warrants our censure, with the admonition that we not be called upon to judge his professional conduct in the future.

*Respondent censured.*