## Cleo Watson McDEARMON v. GORDON & GREMILLION and Ervin & Bengel, Attorneys

5-4944                                445 S. W. 2d 488

Opinion delivered October 13, 1969

*Bowie & Royce,* for appellant.

*Gordon & Gremillion* and *Ervin & Bengel,* for appellees.

CARLETON HARRIS, Chief Justice. This appeal relates to the validity of a contingent fee contract in a domestic relations case. On November 14, 1967, George W. McDearmon, a resident of Shoffner, Jackson County, Arkansas, instituted suit for absolute divorce in the Jackson County Chancery Court against his wife, Cleo Watson McDearmon, appellant herein, a resident of Louisiana, alleging general indignities pursued to the extent as to render his condition in life intolerable. Mrs. McDearmon had already instituted a suit in Louisiana for legal separation through her attorney, Amos K. Gordon, Jr., who practiced law in East Baton Rouge Parish, Louisiana. Shortly after the filing of Mr. McDearmon's complaint, Mrs. McDearmon retained the services of an Arkansas law firm, and this firm, on November 29, 1967, filed an answer, denying the allegations of the husband's complaint, and asserting desertion on the part of Mr. McDearmon, as well as physical abuse. It was further alleged that, if any mistreatment toward the plaintiff existed on her part, same had been condoned and forgiven by Mr. McDearmon, and they had since cohabited, and she had been a good wife. It was further asserted that considerable property was owned by the parties, having been acquired while they lived together as husband and wife in the state of Louisiana, a state with a community property law; that the property consisted of both personalty and realty. She prayed that she be given one-half of the personal property, and one-half of the realty, and the pleading specifically mentioned a number of items of personal property presently located in the state of Arkansas. Subsequently, after Mr. McDearmon amended his complaint, appellant amended her answer, and filed a counterclaim, asking that she be awarded an absolute divorce.

Around the middle of April, 1968, Mrs. McDearmon dismissed the Arkansas law firm, and told Mr. Gordon that a Newport attorney, Claude M. Erwin, had been recommended to her, and Mr. Gordon called Erwin, and retained him. On April 22, Mrs. McDearmon, by letter,

dismissed Mr. Gordon as her attorney, "because everything had been dragging and nothing had been accomplished." According to Gordon, the appellant, on May 13, 1968, requested him to resume his representation. The lawyer testified that he had previously been dismissed four times without any pay, and he, therefore, agreed to resume as her attorney only if she met two conditions. From the record:

"I told Mrs. McDearmon that I would not consider resuming representation of her unless she gave me an unrestricted power of attorney to come up here and negotiate, if I could, negotiate a settlement of the property; also, not just to negotiate the settlement but also to sign it, because I had had too much experience with her vacillation.

"* * * the other condition which she met was that she give me a contract of employment and, in that contract, the bottom limit which I could go down to in negotiating was set forth."

Mrs. McDearmon agreed to these conditions, and it is this contract of employment that occasions this litigation. The provisions of the employment agreement, aside from formal recitations, are as follows:

"That the parties hereto, being client and attorney at law; in a joint effort to conclude that matter known as 'George W. McDearmon versus Cleo Watson McDearmon,' Number 5539 in the Chancery Court of Jackson County, Arkansas, do hereby agree as follows:

1) Mrs. Cleo Watson McDearmon shall give to Amos K. Gordon, Jr., a power of attorney irrevocable for thirty days from date thereof, to enter into a property settlement with her husband, George W. McDearmon on such terms and conditions as said agent may, in his sole discretion, deem necessary, desirable and/or proper or convenient, provided however, that the min-

imum amount under said property settlement which shall be received by Mrs. Cleo Watson McDearmon shall be the sum of Four Hundred Eighty Thousand ($480,-000.00) Dollars.

2) The parties hereto do hereby agree that the negotiations, the manner in which same are conducted and the persons conducting said negotiations, as well as those present at the negotiations, whether or not taking part in same, shall be determined solely by Amos K. Gordon, Jr., and his judgment as to such procedures and participation in & attendance at said negotiations shall be final, these conditions being part of the consideration for which said Amos K. Gordon, Jr. agrees to continue to represent Mrs. Cleo Watson McDearmon in this matter.

3) It is further agreed that should a settlement as contemplated be executed, Mrs. Cleo Watson McDearmon will pay to Amos K. Gordon, Jr., a fee of Forty Five Thousand & no/100 ($45,000) Dollars, * * *.''

The agreement further sets out that Gordon shall negotiate and pay a compromise fee to two attorneys at Baton Rouge, Louisiana, who formerly represented Mrs. McDearmon. It is then provided:

''In the event that all efforts of Amos K. Gordon, Jr., attorney, to secure a property settlement should fail, said attorney shall be compensated at the rate of Thirty ($30.00) Dollars per hour for the time spent in behalf of Mrs. Cleo Watson McDearmon from October 30, 1967, to the date of termination of his representation, this compensation to be in addition to all expenses incurred in pursuit of the affairs of Mrs. Cleo Watson McDearmon.''

The instrument was signed by Gordon and Mrs. Mc-Dearmon on May 13, 1968, at Baton Rouge, Louisiana.

Mr. Gordon testified that, pursuant to this agree-

ment, he arranged a settlement conference with counsel for Mr. McDearmon, and, on June 3, 1968, together with Mr. Erwin, went to the office of McDearmon's attorney, and negotiated a tentative settlement, subject to the approval of McDearmon, this settlement providing that Mrs. McDearmon would receive property of the value of $481,976.50. The lawyer said he tried to discuss this settlement with appellant, but she refused to sign it. Although empowered (under the agreement and power of attorney executed by Mrs. McDearmon) to enter into the settlement himself, this could not be done because it developed that Mr. McDearmon had stipulated that appellant herself must sign it. According to Gordon, when refusing to approve the settlement, appellant told him that she had also dismissed Erwin as her attorney.

About June 17, 1968, Gordon was discharged by Mrs. McDearmon, and he received a telephone call from Mr. McDearmon's counsel, informing him that appellant had come to his (McDearmon's attorney) office without representation, her husband being with her, and the two had agreed upon a settlement.[1]

It appears that the settlement obtained by appellant was very similar to that which Mr. Gordon testified he presented to Mrs. McDearmon.[2] Thereafter, Mr. Er-

[1]McDearmon's attorney testified that he informed the court of the requested appointment from Mr. and Mrs. McDearmon, and that the two came to his office, stating that they had reached an agreement, and he was furnished a hand-written copy of the notes, went over their agreement with them, item by item, and Mrs. McDearmon was very carefully questioned about the fact that she did not want representation.

[2]In appellee's brief, it is asserted that the two compromise agreements were substantially identical, appellees stating:

"* * * The only difference being that under the Gordon compromise, appellant would have received one-half of all of the cash, i. e., approximately $46,324.33 while under the McDearmon compromise, she received only $32,000.00."

This was disputed by both Mr. and Mrs. McDearmon, Mrs. McDearmon stating that the settlement arranged by Gordon was about $43,000.00 less than the minimum of $480,000.00, and Mr. McDearmon testifying that, under the proposed settlement Mr. Gordon

win filed a petition setting out the work done on behalf of appellant and the fact that Mrs. McDearmon was unhappy with his services; he asked that an order be entered relieving him from further responsibilities, alleged that the reasonable value of the services rendered by him was $1,000.00, and asserted that he was entitled to a lien on the properties which were the subject matter of the compromise settlement. Gordon also filed a similar petition, based upon the contract heretofore quoted, and this appellee likewise gave notice that he was claiming a lien on the property. On June 21, both McDearmon and Mrs. McDearmon executed a waiver and entry of appearance, and on June 26, 1968,[3] a decree was entered awarding appellant an absolute divorce from Mr. McDearmon, and further approving the property settlement and separation agreement entered into between the parties on June 21, 1968. The court further found that appellee Gordon fully discharged his duties as counsel for Mrs. McDearmon, and was entitled to the $45,000.00 she contracted to pay him, and that Gordon should have a lien upon any properties received by her in a settlement and approved by the decree of the court. It was further found that Mrs. McDearmon's original Arkansas attorneys were entitled to a $15,000.00 fee (of which $500.00 had already been paid), and that the balance of $14,500.00 was due these attorneys out of the $45,000.00 sum[4]; further, that Mr. Erwin had been retained by Gordon, and the former should be paid from the fee awarded this Louisiana attorney. From the decree so entered, comes this appeal. Only one point is relied upon, viz., that the court erred in enforcing the contingent fee agreement. There are two questions to

had obtained, Mrs. McDearmon would have received $436,213.88, which was $44,000.00 less than the minimum demand.

[3]The decree was actually signed on August 20, and was entered nunc pro tunc as of June 26.

[4]After the appeal was lodged in this court, the Arkansas attorneys filed a motion asking that their names be removed from further proceedings in the case, and their designation as appellees stricken; this court entered an order granting the motion, and gave leave to the attorneys to release the record judgment in the trial court.

be determined in this litigation, and we proceed to a discussion of the first, which is "The law of which state, Arkansas or Louisiana, is controlling?" As pointed out in 50 A. L. R. 2d 258:

"The general adopted view is that unless a contrary intention is expressed in the contract, the law of the place of performance of a contract governs the question whether it has been breached or otherwise terminated or repudiated."[5]

Arkansas very definitely has taken this view.[6] In *Sizer* v. *Midland Valley Railroad Company,* 141 Ark. 369, 217 S. W. 6, this court said:

"Finally, it is insisted that the contract was made without the State and for that reason is not enforceable. But little need be said with regard to this phase of the case. The contract contemplated that it was to be performed in Arkansas, and the suit was in fact brought here. Therefore the law of this contract was in Arkansas. *Midland Valley Rd. Co.* v. *Moran Bolt & Nut Manufacturing Co.,* 80 Ark. 399. In that case the court held that a contract is to be construed with reference to the law of the place of performance and not of the law of the place where it was originated."

---

[5]The other two rules relating to what law governs are mentioned on Pages 259 and 260, one being the law of the place where the contract was entered into, and the other being the "center of gravity" theory. Relative to the first, we find: "Whether there is a breach of contract depends frequently upon a construction of the contract. In this situation the courts have sometimes applied the rule that the construction of a contract is governed by the law of the place where the contract was made." As to the second, it is stated: "Under a theory of comparatively recent origin, called the 'center of gravity' or the 'grouping of contacts' theory of the conflict of laws, the courts, instead of regarding as conclusive the parties' intention or the place of contracting or performance of a contract, lay emphasis rather upon the law of the place 'which has the most significant contacts with the matter in dispute.'"

[6]Appellees make no argument as to which state's law is controlling, contending only that the contract entered into was valid under both Arkansas and Louisiana law.

See also *Crown, Central Petroleum Corporation* v. *Speer, Chancellor,* 206 Ark. 216, 174 S. W. 2d 547, where we said:

"The general rule is that such a contract is to be construed with reference to the law of the place of performance, 'and not of the law of the place where it was originated.'"

In the case before us, it is quite obvious that, though the agreement was executed in Louisiana, it was to be performed in Arkansas. Mr. McDearmon was in Arkansas and, except for the homeplace, all assets were in Arkansas. Mainly, the divorce case was to be heard in Arkansas, and the contract itself between Gordon and appellant recites:

"That the parties hereto, being client and attorney at law, in a joint effort to conclude that matter known as *'George W. McDearmon* versus *Cleo Watson Mc-Dearmon,* Number 5539 in the Chancery Court of Jackson County, Arkansas, do hereby agree as follows: * * *."

We think it is clear that Arkansas law should apply. This brings us to the second question, which is the principal or main question presented for determination. Appellant asserts that the contract between Mrs. Mc-Dearmon and Mr. Gordon is void as against public policy, and therefore unenforceable. The rule is set forth in 30 A. L. R. 188, as follows:

"It is the policy of the law when differences arise between parties to a marriage that no obstacle should be placed in the way of their reconciliation. Consequently, it is not fitting that it should be for the interest of an attorney that there should be no reconciliation. If compensation for an attorney's services is contingent on the securing of a divorce, or if the amount to be paid for his services is proportioned to the amount of

alimony[7] to be received, the attorney is in such a position that his interest would be against a reconciliation of the parties.

"A contract for the payment of a fee to an attorney, contingent upon his procuring a divorce for his client or contingent in amount upon the amount of alimony to be obtained, is void as against public policy."

A number of states are listed, including Arkansas, as following the rule, though there have been slight modifications in some of these states.

In the Florida case of *Sobieski* v. *Maresco* (District Court of Appeal of Florida, Third District), 143 S. 2d 62 (1962), the Chancellor held a contingent fee contract between client and attorney "illegal, void, and unenforceable as against public policy." The appellate court, on reviewing the trial court decision, said:

"The principal issue presented by this appeal is the validity of a contingent fee agreement in a matrimonial action. Neither counsel, in their excellent briefs, nor this court, by independent research, have discovered any Florida decision directly on this point. It does appear, however, that a number of other jurisdictions have passed on the validity of such an agreement and have almost universally declared such employment contracts void. The chancellor's decree, here under review, is in accord with the majority opinion that attorneys' contingent fee employment contracts in matrimonial actions are against public policy and therefore unenforceable. See: *McCarthy* v. *Santangelo* (1951), 137 Conn. 410, 78 A. 2d 240; In re Fisher (1958), 15 Ill. 2d 139, 153 N. E. 2d 832; *Dannenberg* v. *Dannenberg* (1940) 151 Kan. 600, 100 P. 2d 667; *Baskerville* v. *Baskerville* (1956) 246 Minn. 496, 75 N. W. 2d 762; *State ex rel. Nebraska*

[7]In some of the cases cited, the word, "alimony," is also used to include a division of the property owned by the husband and wife.

*State Bar Ass'n* v. *Jensen* (1960), 171 Neb. 1, 105 N. W. 2d 459; In re Smith (1953), 42 Wash. 2d 188, 254 P. 2d 464, 5 Am. Jur., Attorneys at Law, § 166; 30 A. L. R. 189. There appears to be no good reason why Florida should not join those states which hold such agreements void and unenforceable.'"[8]

The state of California, many years ago (1900), held that such a contract was void and unenforceable as against public policy. *Newman* v. *Freitas,* 61 P. 907, *Theison* v. *Keough,* 1 P. 2d 1015 (1931). In *Krieger et al* v. *Bulpitt,* 251 P. 2d 673 (1953), a rather unusual case, the defendant husband in a divorce action entered into an agreement with attorneys under a contingent arrangement that they should receive 10% of the appraised value of all property secured for him (but in no case should the fee be less than $5,000.00, nor more than $7,500.00). The court allowed the $5,000.00 minimum, distinguishing the case from *Newman* and *Theison,* the differences being pointed out in the subsequent case of *Coons* v. *Kary,* 69 California Reporter 712. There, the court explained that:

"* * * in *Krieger* v. *Bulpitt,* 40 Cal. 2d 97, 251 P. 2d 273, a judgment based on a contingent fee contract between attorneys and an impoverished husband to defend a divorce suit was upheld against the attack of a third-party creditor of the husband. But the *Krieger* case differed in important respects from the present case: the husband, unlike the wife here, did not contest the legality of the contract; the contract was to defend, not to prosecute, a divorce action; and the amount of the judgment on the contract covered only the minimum

---

[8]In 1965, the same court in *Salter* v. *St. Jean,* 170 S. 2d 94, held that an employment agreement between attorney and client which related only to the recovery of her separate property was valid, stating:

"We approve the distinction made by the chancellor and specifically hold that contingent fee agreements in domestic relations litigation are against public policy and unenforceable as they relate to alimony or support or property settlement in lieu thereof, but that same are enforceable when they relate to the return of a wife's separate property."

retainer and did not include any contingent recovery. Thus, the ruling in the case only determined that the particular contract was not void on its face, that the judgment on the contract could not be collaterally attacked by a third party (40 Cal. 2d at 101, 251 P. 2d at 673), and perhaps that the minimum retainer under the contract was separable from the contingency aspect of the contract and independently enforceable."

The court reaffirmed its earlier holdings, stating:

"Although the broad statements against contingent fee contracts in matrimonial causes in *Newman* v. *Freitas*, 129 Cal. 283, 61 P. 907, 50 L. R. A. 548, have been somewhat qualified, the policy they express is still valid, a policy explained in *Theison* v. *Keough, supra,* as designed to discourage '* * * the activities of an interloper who might, by reason of a separate and individual interest in the proceeds of the community, be tempted to widen the breach between the spouses. * * *'

"Moreover, the usual justification for contingent fee contracts, that they assure legal representation which otherwise would not be available, does not apply to divorce causes, where the party without funds can be awarded attorney's fees by the court."

California's public policy relative to divorce was stated as follows:

"A financial interest in furthering divorce is directly contrary to California's public policy of preserving marriages, a policy reflected in the waiting period which follows the interlocutory decree of divorce and which is designed to provide a last opportunity for spouses to become reconciled before the entry of the final decree."

Unquestionably, the practice of entering into contingent fees in divorce cases is condemned in nearly all

jurisdictions.[9] In reciting the authorities herein, it has been our purpose to show the extent to which such contracts have been disapproved nationwide.[10] As far back as 1911, this court adopted the same view. In *McConnell v. McConnell*, 98 Ark. 194, 136 S. W. 931, quoting from the Michigan case of *Jordan v. Westerman, supra*, we said:

"Public policy is interested in maintaining the family relation, the interests of society requiring that such relation be not lightly severed, and that families shall not be broken up for inadequate causes or from unworthy motives; and where differences have arisen which threaten disruption, public welfare and the good of society demand a reconciliation, if practicable or possible; and, for these reasons, a contract which tends to prevent such a reconciliation is void."[11]

Appellees recognize our view, but assert that the fee of appellees did not depend upon the success of the litigation, and accordingly, the contract was not contingent. From the brief:

[9]While most states, though holding the contingent fee provision invalid, do allow the attorney a recovery on the basis of *quantum meruit*, some states will not even allow that recovery in this type of case. See *Baskerville* v. *Baskerville*, 246 Minn. 496, 75 N. W. 2d 762; *Jordan* v. *Westerman* (Mich.), 28 N. W. 826. For other related cases, see 100 ALR 2d § 7, p. 1391.

[10]The American Bar Association, at its last meeting on August 12, 1969, adopted a "Code of Professional Responsibility" to replace the old "Canons of Ethics," such code to become effective on January 1, 1970. This code is divided into nine canons, and there is a comprehensive discussion of each. Under Canon 2, EC 2-20, relating to contingent fee arrangements, it is stated, "Because of the human relationships involved and the unique character of the proceedings, contingent fee arrangements in domestic relation cases are rarely justified."

[11]Similarly to the California policy stated in *Coons* v. *Kary, supra*, Arkansas, too, has a policy of preserving marriages, as reflected by Acts 47 and 348 of the General Assembly of 1953, such acts providing for a waiting period of 30 days between the commencement of an action for divorce, and rendition of a final decree where the parties have lived together within the last 12 months' period.

"Appellee was to have been paid regardless of whether or not appellant obtained her divorce, settled her community property interest or reconciled with the husband. The contract included fees not only for work that was to be performed in the future, but also for work that had already been performed by appellee and for which he had not been paid."

It is then argued that the contract was not contingent because it is susceptible of division, *i. e.,* severable. From the brief:

"In the present case, the contract was, as shown above, not contingent, was in no manner based upon a successful outcome of the litigation and gave appellee absolutely no interest in the suit and no basis for or interest in preventing a reconciliation."

We cannot agree with appellees. In the first place, it is evident that the contract was entered into as a matter of concluding the divorce suit filed by Mr. McDearmon; the opening paragraph, heretofore quoted, makes that fact clear. It will also be remembered that Mrs. McDearmon sought an absolute divorce in her counterclaim, and as heretofore mentioned, was awarded the divorce. To say that this contract was not entered into in contemplation of divorce, would be to place form before substance. It is true that the contract did not state that the fee for appellees was dependent upon the successful outcome of the litigation, but it could not be more clearly set out that the $45,000.00 fee sought by appellees *was entirely dependent* upon Mr. Gordon's obtaining a settlement in the minimum amount of $480,-000.00. Any other holding would be violative of the plain meaning of the English language. It may be that the particular attorney here involved would not be influenced by the provision under discussion, but the policy of the law is to prevent an attorney from having a basis for discouraging a reconciliation.

As for an interest, appellees certainly have an interest in the suit; they have a financial interest in the property received by this appellee, for they sought a lien, and the court declared a lien on such property.

We do not quite understand the argument that the contract is severable, therefore not contingent, and accordingly valid. This argument has reference to the fact that, while Provisions 1) and the first part of 3) relate to the fee of $45,000.00 based on the $480,000.00 settlement, the final paragraph in Provision 3) sets out that if the attorney fails to secure the minimum $480,000.00 property settlement, he shall be compensated at the rate of $30.00 per hour for the time spent in behalf of Mrs. McDearmon from October 30, 1967, to the date of termination of his representation. Our perplexity as to the severability argument is based on the fact that we are not asked to uphold the $30.00 per hour compensation; rather, the entire contention in appellees' brief is that Mr. Gordon carried out the provisions of obtaining the $480,000.00 settlement, and is thus entitled to the $45,-000.00. Therefore, it makes little difference whether the contract is severable, and the per hour provision valid, for we are being urged to uphold a portion of the contract which, under Arkansas case law, is absolutely invalid. We express no opinion on the validity of the portion of Provision 3), relating to compensation at the rate of $30.00 per hour, since it is not really involved, for this clause was only effective if Mr. Gordon did not perform fully under the agreement, and he insists that he did perform, never once arguing that he is entitled to the $30.00 per hour.

We think it only fair to say that the record discloses that all attorneys, whose interests are here involved, have spent considerable time and effort in behalf of their client, the transcript disclosing no valid reason for their discharge, and nothing herein contained is intended to be construed to the effect that we are passing upon the proper amount of the fee to be award-

ed. That question is not before us in this litigation, and can only properly be passed upon in the first instance by the Chancellor.

For the reasons heretofore set out, that portion of the decree, awarding attorneys' fees to appellant's lawyers, is reversed, and the cause remanded to the Jackson County Chancery Court, with instructions that the court conduct an evidentiary hearing for the purpose of determining a fair and just fee on a quantum meruit basis.

It is so ordered.

FOGLEMAN and BYRD, JJ., dissent.

CONLEY BYRD, Justice, dissenting. My disagreement with the majority opinion goes both to the holding that the contract here is contingent upon the granting of a divorce and also because the fee awarded is not affirmed upon the record before us on quantum meruit. We ordinarily affirm a chancellor's decree when correct even though it is based on an untenable ground, *Martin v. Taylor*, 188 Ark. 114, 65 S. W. 2d 4 (1934) and *Augusta Cooperage Co. v. Bloch*, 153 Ark. 133, 239 S. W. 760 (1922).

### Quantum Meruit

The record here shows that at the time the contract was entered into, Mrs. McDearmon had hired and fired the law firm of Bankston and Gladney of Baton Rouge, Louisiana, the law firm of Hodges & Hodges of Newport, Arkansas and had hired and fired appellee, Amos K. Gordon four times.

David Hodges of the firm of Hodges & Hodges testified that when he began representing Mrs. McDearmon, the only property settlement offer from her husband was for $350,000.00.

Mr. Gordon testified that it was impossible to keep track of all the time he spent on the case, but the records he did keep showed a total of 552 hours.

While the total contract price was $45,000.00, the trial court deducted $15,000.00 for Hodges & Hodges, required Gordon to satisfy a $65,000.00 claim of Bankston & Gladney, allegedly compromised for $5,000.00, and to settle the $1,000.00 claim of Claude Erwin. Thus the actual judgment in favor of Gordon amounts to only $24,000.00. This is a modest allowance for the services performed by Mr. Gordon. The record here shows that he obtained a settlement in excess of $481,000.00, a $131,-000.00 increase over the offer outstanding at the time David Hodges was employed. Even Hodges was not employed until after Mr. Gordon had done substantial work and had been hired and fired four times.

Furthermore, we know that a lawyer's overhead expenses generally run from 35% to 45% of his gross receipts. Therefore when we consider the 552 hours for which Mr. Gordon kept time, we find that on the basis of a 40-hour week he has worked approximately one-third of a year for an income of $13,200.00 to $15,600.00, and if any time be allowed for nonproductive days and vacation time, he will have worked more than that for Mrs. McDearmon. Two such clients as Mrs. McDearmon in one year would be about all any lawyer could handle. My personal opinion is that the amount of the fee here awarded is most modest when considered from a quantum meruit standpoint under the record before us. In fact the record could support an increased award except for the limitation of the pleadings.

### Contingent Fee

The majority opinion in characterizing this contract as contingent on a divorce ignores the fact (1) that a wife can enforce a separation of community property under the laws of Louisiana during coverture and with-

out a divorce; (2) that under the compulsory counterclaim law of Arkansas, Ark. Stat. Ann. § 27-1121 (Repl. 1962), Mrs. McDearmon had to assert her separate property rights in the Jackson County divorce action, brought by her husband, at the time the contract was entered into or be forever barred; and (3) that there is a presumption in favor of the legality of a contract rather than the illegality thereof.

The basic Louisiana Authority for the separation of property by the wife is Article 2425 et seq. of the Louisiana Civil Code. In *Gastauer* v. *Gastauer*, 131 La. 2 (1912), where it was shown that the husband had abandoned the matrimonial domicile, the court in allowing a separation of property during coverture said:

> "The right of a wife to demand a separation of property is not dependent upon the actual possession by her of separate property, or upon the existence of any claim against her husband for the reimbursement of paraphernal funds. It is enough that she show that the habits and circumstances of her husband render such separation necessary in order to enable her to preserve for her family the earning that she may derive from her separate industry and talent; . . ."

See also Daggett, *The Wife's Action for a Separation of Property*, 5 Tul. L. Rev. 55 (1930), and Morrow, *Matrimonial Property Law in Louisiana*, 34 Tul. L. Rev. 3, 32 (1959), § 7, *Admissibility of Actions Between Husband and Wife During Subsistence of Marriage*.

The facts here show that at the time the contract was entered into, the husband's action for divorce was pending in the Jackson County Chancery Court, and that David Hodges, whom Mrs. McDearmon had recently fired, had entered her appearance therein. Therefore under our compulsory counterclaim law, Ark. Stat. Ann. § 27-1121, Mrs. McDearmon was forced to file and pur-

sue a counterclaim therein for any property rights she might wish to obtain, including any individual personal property which her husband might have in his possession, such as negotiable notes, or for the purpose of declaring a resulting trust. Consequently any contract for legal services to be rendered for her would have to contemplate some action being pursued in the divorce action or all of her rights would be lost.

Furthermore, in *Stroud* v. *Pulaski County Special School District,* 244 Ark. 161, 424 S. W. 2d 141 (1968), we pointed out that the law will not presume that the parties to a contract intended an illegal act. It is pointed out in 17 Am. Jur. 2d *Contracts* § 238 that there is a presumption in favor of the legality of a contract unless the illegality appears upon its face.

I can find nothing on the face of the contract, set forth in the majority opinion, that shows that payment of the fee was contingent upon the granting of a divorce. Neither is there any testimony showing that payment thereof was contingent on the granting of the divorce. From the contract and the testimony, the only evidence is that Gordon was employed only to obtain a separation of the community property acquired under the laws of Louisiana.

Thus when we give credence to the presumption and that our law compelled the wife and her counsel to pursue any legal remedy for a separation of her property in the divorce action, I think we are doing an injustice to the patient counsel who continued to represent Mrs. McDearmon after being fired so many times by suggesting that he by his contract was preventing a reconciliation cf the parties or was encouraging the granting of a divorce.

FOGLEMAN, J., joins in this dissent.