477 A.2d 282

**Joan G. HEAD**

v.

**Howard HEAD.**

**No. 1258, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

July 12, 1984.

John H. Doud, III, Baltimore, with whom were Herbert S. Garten and Fedder & Garten, P.A., Baltimore, on the brief, for appellant.

Melvin J. Sykes, Baltimore, with whom was Max R. Israelson, Baltimore, on the brief, for appellee.

Argued before WILNER, ADKINS and GETTY, JJ.

GETTY, Judge.

Joan G. Head, appellant herein, has filed two appeals in one record from (1) an order of the Circuit Court for Baltimore City (Kaplan, J.) granting partial summary judgment that the marital settlement agreement between appellant and Howard Head, appellee, is valid and binding, and (2) from a final decree of divorce *a vinculo.* The partial summary judgment was granted, by oral opinion, on June 7, 1983; the divorce decree was signed August 1, 1983.

Appellant raises two issues for our determination, namely:

1. Did the chancellor err in granting appellee's motion for partial summary judgment and in entering a judgment which held the marital settlement agreement of December 30, 1981, "valid, binding in all respects, and fully enforceable," notwithstanding appellant's fraud defense, on the ground that "as a matter of law," Mrs. Head could not have been defrauded because of the provisions of paragraph eleven of the agreement?

2. Did the chancellor err in granting a divorce *a vinculo* on the ground of voluntary separation arising out of the agreement of the parties dated December 30, 1981, when there was a pending appeal from his order of June 16, 1983, which upheld the validity of the said agreement, and hence the validity of the alleged voluntary separation?

## Background

Joan and Howard Head were married in Baltimore on June 11, 1968. At that time, Mr. Head retired as Chairman of the Board of Head Ski Company [1] and the company was then sold and moved to Colorado. The parties to this action

---

**1.** Mr. Head owned 60% of the stock in Head Ski. By 1968 he had sold $200,000 to $300,000 worth of stock; the balance was restricted from sale by SEC regulations. At the time of the marriage Mr. Head still owned 320,000 shares which fluctuated in value between $9.00 and $20.00 on the American Stock Exchange.

bought a home and lived together in Maryland for the next thirteen years.

During his retirement, Mr. Head developed and patented the oversized "Prince Racquet" that is now widely acclaimed by both professional and amateur tennis players. Mr. Head reorganized Prince Manufacturing, Inc., (PMI), a company engaged in building tennis practice machines, and began production of the Prince tennis racquet. PMI prospered and continued to be a closely held non-public, New Jersey corporation. The controlling stock interest, royalties, and patents became the principal assets giving rise to the present controversy.

### Facts

Immediately prior to the marriage, the parties executed an antenuptial agreement which provided that upon dissolution of the marriage by either death or divorce Mrs. Head would receive the lesser of a lump sum payment of $400,-000.00 plus one-half of the personalty, or one-third of Mr. Head's estate in lieu of all other claims she might have. Mr. Head desired the agreement because of a prior difficult divorce proceeding and his desire to provide for a daughter by a previous marriage.

During the marriage Mrs. Head pursued her professional education at the University of Maryland and became a member of the bar. Thereafter, she was employed by the law firm of Fedder and Garten, P.A., who represent her in this appeal.

The marriage was markedly less successful than the Prince racquet and in September, 1981, after being locked out of the residence, Mrs. Head filed a bill of complaint for divorce *a mensa et thoro* seeking alimony, use and possession of the home and other relief. Both parties retained counsel and began negotiations to resolve their differences. Mr. Head maintained that the 1968 antenuptial agreement and the entireties ownership of the home defined Mrs. Head's rights upon divorce. Mrs. Head countered that the

earlier agreement was void as against public policy,[2] and invalid, because Mrs. Head had not been independently represented at that time and there had not been full disclosure of Mr. Head's assets.

The legal skirmishing culminated in the marital settlement agreement of December 30, 1981, the validity thereof being the crux of the present case. The agreement, dated and executed December 30, 1981, provided for:

1. Voluntary separation without cohabitation with intent of terminating the marriage.
2. Mutual waiver of alimony.
3. Payment to Mrs. Head by February 16, 1982, of $1,525,000.00 in cash.
4. Division of valuable chattels.
5. Income taxability to Mr. Head of the payments made to Mrs. Head.
6. Payment by Mr. Head of $100,000.00 to counsel for Mrs. Head, plus payment of all divorce costs.
7. Mutual releases.

It is undisputed that Mr. Head made all the payments and executed the division of chattels. Mrs. Head, although attacking the agreement, has retained all of the benefits received pursuant thereto.

The catalyst for the present litigation revolves around Mr. Head's sale, six months after the execution of the December 30, 1981, agreement, of the controlling stock interest, patents and royalties in PMI to Chesebrough-Pond's, Inc., effective June 30, 1982, for the approximate sum of $45,000,000.00.

The provisions of the agreement which are particularly relevant here are as follows:

---

**2.** In *Frey v. Frey,* No. 53, Sept. Term, 1983, decided February 23, 1983, the Court of Appeals expressly held that antenuptial agreements settling the alimony or property rights of the parties upon divorce are not *per se* against public policy and may be specifically enforced.

9. "... The parties have made no provisions for Wife's support since it is intended that the property settlement being made will generate sufficient income to provide for Wife's needs both now and in the future."

10. COUNSEL FEES. [In consideration of the payment of a designated fee to Miller, Rosenthal and Kaufman, P.A. by Howard] "the parties release each other from the payment of any other counsel fees for services, past, present or future, for any matter or thing whatsoever on behalf of either of them, except ... (2) any reasonable fees for services which either party may incur in effecting compliance with this Agreement in the event of a default by the other which shall be paid by the defaulting party ..."

11. "INDEPENDENT COUNSEL—FAIRNESS OF TERMS. This Agreement is being made without full and complete financial disclosure by Husband to Wife. It has been explained to Wife and she understands that such full disclosure is available to her if she should desire it, but she has expressly waived such disclosure for the reasons hereinafter set forth:

A. The parties entered into an Ante-Nuptial Agreement dated June 10, 1968, copy of which is annexed as Exhibit D and incorporated hereby by reference. Wife has contended that that Agreement is invalid and unenforceable, and Husband has contended that that Agreement is valid and enforceable. Wife has been advised by independent counsel of her own choice as to the respective strength of the parties' contentions and of the hazards of litigation of that issue.

B. This Agreement provides significantly more than the Wife would have received under the Ante-Nuptial Agreement and is in her judgment more than sufficient to care for her needs now and in the future.

C. Wife recognizes that there may be no proportionality in the relationship of the amount herein provided for her and the total assets and resources of Husband, and further recognizes that the consideration passing

to her under this Agreement may not be a substantial part or may be a relatively insignificant fraction of Husband's total worth.

D. . Each party, being independently advised by counsel of his or her own selection, regards the terms of this Agreement as being fair and reasonable, and fully satisfactory to each of them, and each of them has signed it freely and voluntarily without relying on any representations other than those expressly set forth herein."

13. "FURTHER ASSURANCES. The parties for themselves and their respective heirs, personal representatives and assigns, do mutually agree to join in or execute any instruments and to do any other act or thing that may be necessary or proper to carry into effect each and every part of this Agreement, or to release any dower or other right in any property which either of said parties may now or hereafter acquire, including the execution and delivery of such deeds and assurances as may be necessary to carry out the purposes of this Agreement."

14. "DIVORCE PROCEEDINGS. With the approval of any Court of competent jurisdiction in which any divorce proceeding may now be pending or which may hereafter be instituted, this Agreement shall be incorporated in any decree of absolute divorce which may be passed by said Court. In the event the Court shall fail or decline to incorporate this Agreement, or any provision thereof, in said decree, then and in that event the parties, for themselves and their respective heirs, personal representatives and assigns, agree that they will nevertheless abide by and carry out all of the provisions thereof. It is further agreed that regardless of whether or not this Agreement or any part thereof is incorporated in any such decree, the same shall not be merged in said decree, but this Agreement and all the terms thereof shall continue to be binding upon the

parties and their respective heirs, personal representatives and assigns.

In any divorce action brought by either party, the parties agree that they will apply to the Court to seal the Court's file." •

15. "INTEGRATION CLAUSE. This Agreement contains the final and entire understanding of the parties. There are no representations terms, conditions, statements, warranties, promises, covenants or understandings, oral or written, other than those expressly set forth herein."

## The Litigation

Mrs. Head's divorce complaint was filed, as previously stated, on September 25, 1981. Mr. Head's answer, alleging that the alimony and personal property issues were moot by reason of the settlement agreement, was filed June 9, 1982. Contemporaneously, Mr. Head filed a cross complaint seeking a divorce *a mensa et thoro* alleging a voluntary separation commencing on December 30, 1981, the date of the agreement.

On December 23, 1982, Mrs. Head answered the cross complaint setting forth that the agreement dated December 30, 1981, was procured by the fraudulent representations and concealment of assets by Mr. Head. A supplemental cross bill was filed by Mr. Head on January 25, 1983, seeking a divorce *a vinculo* based upon voluntary separation. The response thereto was a re-filing of the answer to the earlier cross bill filed by Mr. Head for a divorce *a mensa et thoro*.

Pursuant to Md.Rule 610, Mr. Head filed a motion for partial summary judgment on the issue of the validity of the agreement of December 10, 1981. This matter was heard by Judge Kaplan on June 7, 1983, and the agreement was upheld in an oral opinion by the court on the same day. A final Order was signed by the court on June 16, 1983,

following reargument which had been requested by Mrs. Head.

Mrs. Head appealed the ruling upholding the agreement on June 29, 1983, and the trial court granted Mr. Head an absolute divorce on August 1, 1983; a timely appeal was filed from the granting of the divorce.

## The Agreement

■ We shall affirm the trial court's conclusion that the agreement of December 30, 1981, was valid. Both parties were represented by independent and able counsel who crafted the agreement after two months of intense negotiation. Mrs. Head alleges fraudulent concealment relating to the true value of her husband's interest in PMI, coupled with his assertions that PMI was beset with patent infringement suits that imperiled both the patents and royalties. The record establishes that Mrs. Head filed a request for production of documents on March 18, 1983. No. 28 of the 56 items covered requested the particulars of suits involving PMI's involvement in litigation pending before the U.S. District Court for the District of South Carolina, the U.S. District Court, North Central District of California, and in the U.S. District Court for the District of New Jersey. The company, therefore, was apparently involved in litigation, although we are unable to determine the exact nature of the various proceedings.

In her affidavit opposing the motion for partial summary judgment, Mrs. Head stated that the financial statement submitted to Mrs. Head's counsel showed that the assets of PMI, as of March 30, 1981, amounted to $2,551,000.00, which was consistent with her prior understanding. A sale at seventeen times that figure, she contends, establishes fraudulent concealment. We disagree. The financial statement compiled by the accounting firm of Peat, Marwick, Mitchell and Co. stated the *carrying value* of PMI to be $2,551,000.00. Mrs. Head, as a lawyer, knew or should have known that carrying value is not necessarily representative of real value.

In a letter to opposing counsel dated October 27, 1981, Mrs. Head's counsel Theodore S. Miller, recognized that the PMI figure in the financial statement did not represent the actual value of the PMI holdings. He characterized the net book value listed as being "patently absurd in a growth situation such as exists with Prince." Mr. Miller also noted that the statement did not reflect the value of royalty payments received from Prince and Wilson.

In pertinent part, the letter states:

"The marital home at Blythewood Road is owned by our clients as tenants by the entireties. For purposes of settlement discussions we value that property at $500,000 and the contents at $150,000, one-half of which is $325,-000.... The total (including $400,000 under 1968 agreement) comes to $725,000. Mr. Head has offered our client an additional $325,000 in full settlement of the case. To put it simply, that is not enough."

Clearly, Mrs. Head and her counsel were aware that the PMI figure did not represent the actual value of Mr. Head's interest in PMI. The rejection of the offer to compromise, as of October 27, 1981, in counsel's words, was because the offer by Mr. Head "is not enough." Two months later, when the ante was raised to $1,525,000.00, with Mr. Head paying the tax liability on the total sum, it was enough and the agreement of December 30, 1981, was signed.

It is with ill grace that one who knows that a financial statement does not reflect actual value, and who makes no further effort to determine what that value may be, negotiates a substantially more lucrative financial settlement and, after accepting the higher figure, complains that the true value of the very asset in controversy was fraudulently concealed. We believe that Mrs. Head, fully aware that the true value of PMI had not been disclosed, negotiated a settlement figure that was acceptable, irrespective of her husband's total worth. Having made that election, she is bound to accept what Mr. Head was obligated to pay.

We conclude that Judge Kaplan's order granting partial summary judgment is sustainable for two reasons, namely:

1. Retention of the consideration by Mrs. Head thereby ratifying the agreement, and

2. The undisputed facts establish that Mrs. Head has knowingly contracted away the grounds on which she now attacks the 1981 agreement.

The principle that the right to rescind may be waived by continuing to treat the contract as a subsisting obligation is well established. *Michael v. Towers*, 253 Md. 114, 251 A.2d 878 (1969); *Kemp v. Weber*, 180 Md. 362, 24 A.2d 779 (1942); *Bagel Enterprises v. Baskin and Sears*, 56 Md. App. 184, 467 A.2d 533 (1983). In *Lazorcak v. Feverstein*, 273 Md. 69, 76, 327 A.2d 477 (1974), the Court of Appeals stated that the party seeking rescission must give to the other party notice of "at least the intent" to restore the parties to the relative positions which they would have occupied if no such contract had ever been made. Mrs. Head has retained the benefits of the contract, presumably as a down payment on the total sum to which she believes she is entitled. She relies on *Taylor v. Whitehurst*, 151 Md. 621, 135 A. 428 (1926), recognizing that where an agreement is voidable for fraud, restitution of the consideration which passed under the voidable agreement may be made by set-off and need not be made by an offer of restoration. Conceding that one may retain what is indisputably one's own in a fraud situation, the exception in *Taylor* has no application here. Mrs. Head, in the event the 1981 agreement is voided, faces the validity of the earlier 1968 antenuptial settlement which provides substantially less than the 1981 agreement. *Taylor*, therefore, is inapposite.

Judge Kaplan did not expressly base his decision on the failure to return the consideration received. He agreed, however, that Mr. Head's position on rescission was correct, stating:

"Where is the equity in a woman, or a man, either one, accepting payment of a million five hundred twenty-five

thousand dollars, has had that million five hundred twenty-five thousand dollars for a substantial period of time, has never offered to return it or to return the hundred thousand dollar counsel fee, or any of the personal property, and now says it's time to fight again. We got another agreement I'd like to set aside."

Paragraph 11 of the agreement recites that the agreement is made without full and complete financial disclosure by husband to wife. The right to full disclosure is made available to the wife, which she expressly waives. Additionally, the wife recognizes that there may be no proportionality in the relationship of the amount provided for the wife and the total assets and resources of her husband. The wife, under paragraph eleven, acknowledges that the consideration passing to her under the agreement may not be a substantial part "or may be a relatively insignificant fraction of Husband's total worth."

It would be difficult to incorporate more explicit language in expressing what was fairly within the contemplation of the parties. Judge Kaplan correctly interpreted the language employed when he said,

"Paragraph eleven states clearly to the Court that the amount of the settlement was so satisfactory to Mrs. Head and Mrs. Head's counsel that they were not interested in what the total amount of Mr. Head's estate was, that it made no difference."

We agree.

Mrs. Head, citing *Marten's Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534 (1982), insists that exculpatory language will not insulate one from the consequences of his fraud by contract. *Marten's* is readily distinguishable from the case *sub judice*. In *Marten's*, the sellers of an automobile dealership fraudulently represented that a modest profit had been earned for the year prior to the sale. At the time the representation of profitability was made, the sellers had knowledge of and failed to disclose to the purchas-

ers that the dealership had sustained a $69,000.00 loss for the year in question.

The Court of Appeals, in *Marten's*, said:

"A party to a contract cannot, by misrepresentation of a material fact, induce the other party to the contract to enter into it to his damage, and then protect himself from the legal effect of such misrepresentation by inserting in the contract a clause to the effect that he is not to be held liable for the misrepresentation which induced the other party to enter into the contract. The effect of misrepresentation and fraud cannot be thus easily avoided. If it could be, the implied covenant of good faith and fair dealing existing in every contract would cease to exist. (*[Jackson v. State]* 241 N.Y. 563, 150 N.E. 556 (1925) (adopting the opinion of Hubbs, J., in *Jackson v. State*, 210 App.Div. 115, 205 N.Y.S. 658, 661 (1924); compare *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.2d 599, 157 N.E.2d 597 (1959))"

The trial court in the instant case, however, determined that paragraph eleven of the agreement was not an ordinary integration clause, but a specific provision dealing with the parties' understanding which makes any discrepancy between what Mrs. Head received and Mr. Head retained within the contemplation of the parties and within the realm of the bargain. *Creamer v. Helferstay*, 294 Md. 107, 448 A.2d 332 (1982). The trial court's conclusion based on the facts of this case does no violence to the principle expressed in *Marten's Chevrolet, supra.*[3]

### Divorce

By Order dated June 16, 1983, the trial court held the agreement valid. Thereafter, on June 20, 1983, counsel for both parties appeared before a Master and Mr. Head testified without objection to the voluntary separation. On June

---

**3.** Paragraph 15 of the agreement contained a standard integration clause.

29, 1983, Mrs. Head filed an appeal, clearly premature, from the Order granting partial summary judgment. The court signed a decree granting Mr. Head a divorce *a vinculo* on August 1, 1983. Mrs. Head then filed a second appeal on August 30, 1983.

█ We shall dismiss the appeal of June 29, because it related only to a single issue and was not a final judgment. Rule 605a. The divorce issue, however, brings up for review the prior interlocutory order granting partial judgment which we have previously addressed.

The supplemental cross bill filed by Mr. Head on January 25, 1983, alleged a voluntary separation agreement commencing on December 30, 1981. The one year period necessary to grant the divorce would have expired on December 30, 1982. Additionally, Article 16, Sec. 24 of the Md.Code, as amended by the Acts of 1983, provides that a divorce *a vinculo* may be granted upon the application of either party when the husband and wife for any reason have lived separate and apart without any cohabitation and without interruption for two years. The two-year period in this case expired December 30, 1983. Mr. Head would be entitled to a divorce based on the supplemental cross bill or on the separate ground of two years separation without cohabitation. Without discussing whether the Circuit Court retained fundamental jurisdiction to enter the divorce subsequent to the premature appeal by Mrs. Head, we shall vacate the divorce decree and remand the matter to the Circuit Court for the entry of a new decree incorporating the 1981 agreement.

APPEAL DATED JUNE 29, 1983, DISMISSED.

APPEAL DATED AUGUST 30, 1983, JUDGMENT AFFIRMED AS TO PARTIAL SUMMARY JUDGMENT, DIVORCE DECREE VACATED AND CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF NEW DECREE.

COSTS TO BE PAID BY APPELLANT.