505 A.2d 868

**Joan G. HEAD**

v.

**Howard HEAD.**

**No. 756, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

March 10, 1986.

Gary I. Strausberg (Matthew W. Nayden, Melnicove, Kaufman, Weiner & Smouse, P.A., on brief), Baltimore, for appellant.

Melvin J. Sykes (Max R. Israelson, on brief), Baltimore, for appellee.

Argued before WILNER, ROSALYN B. BELL and WENNER, JJ.

ROSALYN B. BELL, Judge.

Joan Head appeals the decision of the Circuit Court for Baltimore City awarding Howard Head attorneys' fees pursuant to a 1981 antenuptial agreement executed between the parties. Appellant presents three propositions for our resolution:

"I. The trial court erred in finding that in seeking a judicial determination that the marital settlement agreement was induced by fraud, Joan had defaulted on the agreement.

"II. The trial court erred in finding that Joan's defense was made in bad faith and without substantial justification when Joan had presented a plausible and colorable claim of fraud.

"III. The trial court erred in tripling the reasonable fee of Howard's counsel and in allowing an award of which two-thirds amounted to a contingent fee which is improper in a domestic relations case."

The details of the controversy that brought Joan Head and Howard Head to this Court can best be gleaned by returning to this Court's opinion in *Head v. Head*, 59 Md.App. 570, 477 A.2d 282, *cert. denied*, 301 Md. 471, 483 A.2d 754 (1984). We will not retrace that lengthy tour beyond the briefest summary.

Before marrying Joan Head, Howard Head had had both substantial net worth and a previous unpleasant divorce. Consequently, he and his future wife entered into an antenuptial agreement. Following their marriage, Mr. Head

developed and patented the oversized "Prince" tennis racquet. He also purchased an interest in and reorganized Prince Manufacturing, Inc. to produce the racquet. Unfortunately, "[t]he marriage was markedly less successful than the Prince racquet." *Head, supra* at 573, 477 A.2d 282.

Mrs. Head sued for divorce in the Circuit Court for Baltimore City and sought to set aside the antenuptial agreement. Subsequently, in December of 1981, the parties entered into a new agreement. There the matter rested until Mr. Head moved for summary judgment based upon the December 1981 agreement. Mrs. Head opposed, alleging that the 1981 agreement was fraudulent because her husband's assets were seventeen times greater than he had represented. The chancellor rejected the argument of Mrs. Head and entered a decree upholding the 1981 agreement. Mrs. Head appealed that decision. *Head v. Head, supra.*

While that appeal was pending, Mr. Head filed a petition for counsel fees under a provision in the 1981 agreement which contained a mutual waiver of counsel fees, except for any reasonable fees incurred in effecting compliance with the agreement in the event of a default. Mr. Head contended that his wife's defaults under that agreement necessitated counsels' services to enforce compliance with the agreement. That petition lay idle until the appeal process was completed, at which time Mr. Head filed a supplemental motion adding a request for the fees rendered in the appeal. An answer was filed and a hearing on fees was held before the same chancellor who handled all other aspects of the case.

At this hearing, testimony revealed that Mr. Head had paid his counsel $50,000 for their work in connection with the trial. Counsel had not billed for the appeal, claiming they were looking to the court for "some guidance in setting the fee."

The court accepted evidence on the value of counsels' services. At the conclusion of this hearing, the chancellor ordered a fee of $120,000 including a result-obtained

amount.  It was under the provision in the December 1981 agreement that payment by appellant to appellee for his attorneys' fees was awarded.

## I.  DEFAULT

*Right to Litigate Validity of Agreement*

■ Appellant first contends that fees were not properly awarded to appellee because she did not default under the agreement.  She asserts that "litigating a defense that the Agreement was induced by fraud cannot constitute a default."  Appellant concludes that attorneys' fees were not incurred in effecting compliance with the agreement because she was seeking to have the agreement set aside as a fraud.  We do not concur.

The word default is defined as the "omission or failure to perform a legal or contractual duty."  Black's Law Dictionary 376 (5th ed. 1979).  We cannot imagine any closer nexus between renouncing all responsibility under a contract and a default or failure to abide by its terms than what occurred here.

■ The second prong of appellant's position superficially has more substance.  She points out that if her claim that the agreement was fraudulently induced is deemed a default, her right to challenge the agreement is abrogated.  She concedes there is no Maryland case on point, but refers us to *Locke Paddon v. Locke Paddon,* 194 Cal. 73, 227 P. 715 (1924) and *Nacht v. Nacht,* 167 Cal.App.2d 254, 334 P.2d 275 (1959), to support her claim.  Both *Locke Paddon, supra* and *Nacht, supra,* however, are inapposite.  In both cases there were releases and waivers of fees and costs in the respective agreements.

In *Locke Paddon, supra* the wife sought to set aside the agreement based on fraud.  The chancellor had not decided the ultimate issue, but awarded alimony *pendente lite,* counsel fees and costs.  The California Supreme Court affirmed the award on appeal, holding that the basis for

awarding costs and fees to the wife to adjudicate her rights was inherent in the marital relationship. The Court then opined: "It is, of course, also necessary for the court to determine that the necessities of the wife warrant the making of the order and that the husband is able to pay." *Id.* 227 P. at 718.

The relevant issue presented in *Nacht, supra* was also the right of the wife to costs and fees on appeal. The *Nacht* Court held that

"[w]hen the wife in good faith challenges the continued existence of the property settlement, or its validity, regardless of whether she is right or wrong, where she is unable to finance the appeal, she must have suit money to prosecute the appeal or she will lose her right to challenge the continued existence of the agreement."

*Id.* 334 P.2d at 284.

The cases on which appellant relies did award costs and fees despite the prior agreement to the contrary, but did so based partly on the wife's need. The case at bar is not a case of a spouse without resources being precluded from litigating her rights. Appellant is not dependent upon the largesse of appellee for support.

Of even more significance, both *Locke Paddon, supra* and *Nacht, supra* require that the wife's suit must be and was in fact brought in good faith. In the instant case the chancellor found appellant's "actions ... in trying to upset the agreement were without substantial justification. In fact, they were without any justification at all as far as I can see...." This is scarcely the good faith which was deemed a prerequisite in the precedents relied on by appellant.

As we stated, appellant suggests that she is being penalized through the imposition of fees and thus her right to litigate the fraud defense was infringed. We think not—chilled perhaps, but not infringed. The right to fees in case of default was a contract term appellee insisted be included in the contract based on his experience. Appellant seeks to

avoid that term of the contract. The object of the provision was to deter non-compliance. Wilfull non-compliance amounts to a default and that is what occurred here.

### Instances of Default

The 1981 agreement provided in part:

"As of the date of this Agreement, the parties have mutually agreed voluntarily to live separate ... with the intention of terminating the marriage."

\* \* \* \* \* \*

"2. <u>VOLUNTARY SEPARATION, NON-MOLESTA-TION</u>. The Parties agree to separate and from the date of this Agreement voluntarily to live separate and apart ... with the intention of terminating their marriage."

\* \* \* \* \* \*

"11. <u>INDEPENDENT COUNSEL—FAIRNESS OF TERMS.</u> This Agreement is being made without full and complete financial disclosure by Husband to Wife. It has been explained to Wife and she understands that such full disclosure is available to her if she should desire it, but she has expressly waived such disclosure for the reasons hereinafter set forth:"

\* \* \* \* \* \*

"B. This Agreement provides significantly more than the Wife would have received under the [earlier] Ante-Nuptial Agreement and is in her judgment more than sufficient to care for her needs now and in the future.

"C. Wife recognizes that there may be no proportionality in the relationship of the amount herein provided for her and the total assets and resources of Husband, and further recognizes that the consideration passing to her under this Agreement may not be a substantial part or may be a relatively insignificant fraction of Husband's total worth."

The chancellor found by clear and convincing evidence that appellant defaulted under the agreement in numerous ways. He specified two.

### —Prince Stock—

Appellant sought to set the agreement aside alleging fraud because the Prince stock owned by appellee was represented to have a book value of $2,551,000 at the time the contract was signed, but sold for $45,000,000 approximately six months later. She claims the evidence was overwhelming that appellant knew the stock was undervalued.

The chancellor found that this defense to the agreement was clearly aimed at forestalling the purposes and provisions of that contract. He concluded that since the litigation was without justification, her claims amounted to a default. We concur.

### —Voluntary Separation—

Appellant knowingly signed the agreement which in part stated that the parties voluntarily and mutually agreed to live separate and apart. She denied that averment in the litigation. The chancellor concluded that appellant defaulted by denying the representation made in the agreement. We agree.

In summation, the chancellor found and we agree that there were numerous defaults under the agreement. Thus, he did not err in concluding that reasonable fees should be awarded against the defaulting party under the terms of the 1981 agreement.

## II.  BAD FAITH

Under Rule 1–341, the chancellor may award litigation fees in the appropriate case. That Rule provides:

"In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it."

The chancellor utilized this Rule in conjunction with the 1981 agreement when awarding fees to appellee. Appellant urges upon us, however, that she did not bring this case "in bad faith or without substantial justification" and hence Rule 1–341 should not be applied against her.

In view of our affirmation of the chancellor's finding that appellant defaulted, thus permitting the award of counsel fees under the agreement, her argument as to the Rule is only of academic interest. Accordingly, it need not and will not be addressed.

### III. REASONABLE FEES

The 1981 agreement attempted, albeit unsuccessfully, to resolve the financial differences between the parties, but instead gave rise to an escalation of the controversy. The fee dispute centers around the following provision in the agreement:

"10. COUNSEL FEES. [In consideration of the payment of a designated fee to appellant's then attorneys by appellee] [t]he parties release each other from the payment of any other counsel fees for services, past, present or future, for any matter or thing whatsoever on behalf of either of them, except ... (2) any reasonable fees for services which either party may incur in effecting compliance with this Agreement in the event of a default by the other which shall be paid by the defaulting party ..."

At the hearing on counsel fees, appellant stipulated to the time spent by appellee's counsel in preparation of the case —227 hours. She did not present any evidence or expert testimony as to the reasonable value of those services.

Appellee presented James G. Beach, Jr., an attorney, testifying as an expert in domestic relations fees. Mr. Beach reviewed and disclosed appellee's counsels' entire file of the trial and appeal at this hearing. He announced that he "took into account the fact that [appellant's] attorneys, according to the records, were paid a counsel fee of $100,-000" which the chancellor pointed out "was in accordance

with the agreement and before there was even any fight-ing."[1]

Mr. Beach concluded that a fair and reasonable fee for the services rendered by appellee's counsel would be $125,-000. He applied three different approaches in arriving at this result. First, he looked at the time spent by each of appellee's two attorneys which he opined was nonduplica-tive except for the time spent in open court. He then assessed a basic $200 hourly rate, which was, in his opinion, "well within the realm of hourly rates charged in this area for this type of case" for "the work ... done and the reputation that ... [appellee's counsel] have at the Bar." He rounded the hours to 200 giving "a fee based on an hourly rate, of $40,000." He related that he "looked at the file in detail ... and it is my opinion that the average practioner or practioners could not have performed the work that was performed in that file in 200 hours, so I looked at it first ... on a quantum meruit for the work performed at that time without assessing a result factor to it, and this would be my first method of arriving at the fee." He concluded that $75,000 would be the fee on a quantum meruit basis and had "no problem attributing a result factor ... of $50,000," arriving at the sum of $125,-000.

His second approach computed the actual time spent at the hourly rate of $200. To this $40,000 plus figure, he added a result bonus of $85,000 based on the tremendous financial exposure of appellee if appellant had succeeded on her claims.

Mr. Beach's third approach was to start with the basic time charge of approximately $40,000 "and again looking at the many ways that I have in the past used to arrive at a result factor I simply doubled your hourly rate, and again I

---

1. We assume this was the fee paid to appellant's former attorneys who represented her in connection with negotiating the revised agreement in 1981. We do not see how this could be deemed "before there was even any fighting."

would be comfortable in saying a result factor of 80 would be fair and reasonable. That would give me $120,000 but I really believe $125,000 is a fair and reasonable fee."

The chancellor found that the services of appellee's counsel could be reasonably valued at $125,000. He reduced the $125,000 figure to $120,000 because of possible duplicative effort by the two attorneys.[2] In awarding that amount, the court stated: "You can't have [contingent fees] properly or ethically, but there is nothing wrong with parties getting $200.00 an hour and if the result warrants to come back and talk about a higher fee at the end of the case, so ... $120,000 that certainly is a reasonable fee for what was done."[3]

Appellant asserts that the chancellor erred in awarding a fee which (1) was unreasonable and (2) amounted to a contingent fee which is improper in a domestic relations case. We will first consider appellant's second contention.

### Contingent Fee

■ Appellant contends that the award was result-based and thus is, in effect, a contingent fee. As the Code of Professional Responsibility recognizes, contingent fees are rarely justified in domestic relations cases. *Code of Professional Responsibility*[4] EC 2–18 (1984 Repl.Vol.). The rationale has been that a contingent arrangement gives the attorney an interest in avoiding reconciliation between the parties. 1 S. Spieser, *Attorney's Fees* § 2.6 (1973). Furthermore, alimony is not an assignable property right. *Id.*

---

**2.** The chancellor noted "[t]here was, to my recollection, de minimus overlapping of services rendered by [counsel]. One was doing one thing and the other was doing something else. I rarely saw them together. [U]sually ... only one appeared."

**3.** We again note that appellant offered no testimony or evidence to demonstrate that the fee charged was unreasonable. We do not speculate whether the chancellor might have arrived at a different result if he had contrary evidence before him.

**4.** Rule 1230, appendix F.

The issue then is whether utilizing "results" as a factor in a domestic case makes a fee, in part, contingent.

A contingent fee, as defined in Black's Law Dictionary, is an

"[a]rrangement between attorney and client whereby attorney agrees to represent client with compensation to be a percentage of the amount recovered; *e.g.* 25% if case is settled, 30% if case goes to trial. Frequently used in personal injury actions. Such fees are often regulated by court rule or statute depending on the type of action and amount of recovery."

Black's Law Dictionary 553 (5th ed. 1979).

Ethical Consideration 2–18 notes that contingent fees "often, and in a variety of circumstances, provide the only practical means by which one having a claim against another can economically afford, finance, and obtain the services of a competent lawyer to prosecute his claim." In addition, "a successful prosecution of the claim produces a *res* out of which the fee can be paid." *Id.*

■ One of the factors to be considered in setting a fee may be the result obtained. *Code of Professional Responsibility* DR 2–106(B)(4), *supra.* To that extent, many fees do involve a contingent element. *Kenny v. McAllester*, 198 Md. 521, 84 A.2d 897 (1951); Annot. 57 A.L.R.3d 475, 517. However, to assert that the fee awarded here was contingent fails to recognize that a fee may take into consideration the "amount involved and the results obtained" under DR 2–106(B)(4), and still not be contingent in the usual sense of the word.

■ We hold that in the case *sub judice*, the fee awarded was not contingent. We conclude this because the fee was not directly related by percentage or formula to the amount recovered or protected. Additionally, it failed to meet the generally accepted twofold purpose of a contingent fee. Not only could the parties clearly afford to retain the services of counsel on a fixed fee or hourly rate, but the successful resolution of the claim for appellee would not

produce a *res* out of which the fee could be paid. There could be no *res* produced. The funds at issue were already in his possession. It was the shielding of those funds from appellant's claim that was at issue. We do not mean to suggest that a contingent fee can never be agreed to where the parties can afford to pay counsel fees or where the *res* is a fund that is being protected. We hold only that these are not the generally accepted purposes of such fees.

Next, we consider appellant's challenge to the reasonableness of the fee. In doing so, we will examine not only the actual amount awarded but we will consider the fee arrangement as well.

### Excessive Amount

Appellate asserts that the fee awarded to appellee was triple what the reasonable fee should be. Our task then is to determine whether the fee awarded was excessive. We point out that if it is not an unreasonable fee for appellee to pay for the services of his counsel, then under the terms of the 1981 agreement, it, *a fortiori,* is not an unreasonable sum for appellant to pay.

In the case *sub judice*, our review of the record indicates that appellee and his counsel did not agree prior to the retention of services as to what the fee rate would be. Thus, we are dealing with the reasonable value of services rendered on a quantum meruit basis.

In the absence of a contract, statute or court rule fixing compensation, an attorney who performs legal services for his or her client is entitled to be paid the reasonable value of those services. The determination of the reasonable value involves a question of fact to be answered in light of the particular circumstances of each case. 1 Speiser, *Attorney's Fees*, § 8.2, *supra.* The trial court enjoys a large measure of discretion in fixing the reasonable value of legal services. That amount will not be disturbed unless it is clearly an abuse of discretion. *See Danziger v. Danziger,* 208 Md. 469, 118 A.2d 653 (1955); *Plakatoris v. Bainder,*

204 Md. 223, 103 A.2d 839 (1954); *Title Guarantee and Trust Co. v. Burdette,* 104 Md. 666, 65 A. 341 (1906).

In *Foster v. Foster,* 33 Md.App. 73, 364 A.2d 65, *cert. denied,* 278 Md. 722 (1976), the late Judge Davidson explained the extent of the chancellor's discretion:

> "In determining the amount for a reasonable counsel fee, the ordinary factors of labor, skill, time and benefit, as well as the financial resources of the parties, must be taken into account. (footnote omitted) While time is one of the applicable factors, the record need not contain evidence specifically delineating the number of hours spent by counsel. Because the record itself discloses the nature of the proceedings, it is some evidence of the extent of the attorney's efforts. Given this evidence, the chancellor may rely upon his own knowledge and experience in appraising the value of an attorney's services." (footnote omitted).

*Id.* at 77, 364 A.2d 65; *see Holston v. Holston,* 58 Md.App. 308, 325–26, 473 A.2d 459, *cert. denied,* 300 Md. 484, 479 A.2d 372 (1984).

The *Code of Professional Responsibility* espouses a number of considerations involving the setting of fees by counsel. Disciplinary Rule 2–106(B) [5] states:

> "(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
>
> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
>
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

---

**5.** This rule applies to both fixed fees and fees calculated on a quatum meruit basis.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent."

These factors were mentioned and approved in *Goldman v. Eisinger*, 289 Md. 611, 425 A.2d 1356 (1981). *See also* EC 2-16, 2-17, *supra.*

## A. Time Spent Formula

Appellant suggests that the trial court may only consider an hours expended multiplied by the rate per hour formula to establish a reasonable fee. Appellant concedes that the total hours of service claimed was 227, and that based on a rate of $200 an hour, the fee would amount to $45,400. She points out that the actual amount awarded was almost three times greater. Appellant claims that the $45,400 is the lodestar [6] and should not be increased based on result.

Certainly time spent and hourly rate are important factors.[7] That does not mean, however, that the computation of a reasonable fee ends there. DR 2-106(B) speaks in terms of time required as well as skill, difficulty, amount involved, experience, ability, reputation, and results obtained. *Id.; see also* EC 2-16, *supra.* While factors

---

6. The term "lodestar" is used in federal fee award cases under 42 U.S.C. § 1988 and refers to the figure representing the number of hours worked multiplied by a reasonable hourly fee.

7. The attorney who does not maintain adequate time records is making a mistake according to all the practice manuals, despite the fact that lack of time records was excused in *Foster v. Foster*, 33 Md.App. 73, 364 A.2d 65, *cert. denied*, 278 Md. 722 (1976).

other than time spent may be taken into account, they must produce a reasonable fee.

## B. Result Factor

■ The issue evolves into whether the result factor in this case produced an unreasonable fee. After a review of the facts, this Court is left with a definite and firm conviction that the fee is in excess of a reasonable fee. DR 2–106(B), *supra.* Thus we conclude the chancellor abused his discretion in finding that $120,000 was a reasonable figure.

Appellant suggests that the consideration of results in a domestic case was precluded by the decision in *Attorney Grievance Commission v. Kerpelman,* 292 Md. 228, 438 A.2d 501 (1981). In *Kerpelman, supra,* Kerpelman received a $2,000 retainer and contracted to bill at $70 per hour. Post-trial, however, he demanded a fee of $8,500 and then based on successful results raised that to $25,000 when the client refused to pay. Although the Court calculated that based on his hourly rate the most Kerpelman could charge for his 38.8 hours of service was $2,716, the Court did not explicitly or implicitly denounce consideration of results in fixing fees in a domestic case. Nor does *Kerpelman, supra* bar fixing a fee by application of the factors in DR 2–106(B), *supra.* What *Kerpelman, supra* does preclude is demanding excessive result figures.

■ Turning to the result figure of $75,000 awarded by the chancellor in the case *sub judice,* we conclude that this figure is unreasonable. The testimony offered as to the value of counsels' services should have been disregarded since it could not justify the ultimate amount awarded.

Under the straight hourly rate method of $200.00, appellee's expert testified that $85,000 or two-thirds of the total fee award, could be demanded upon winning the case based

on the financial exposure of appellee.[8] Calculating on a quantum meruit basis of $75,000, the expert added a bonus of $50,000. Doubling the hourly rate, he determined that $80,000 would be a fair result fee. Although the total figures under the three methods added up to similar amounts, the expert did not explain how he could support three different rates for the same work or three different result factors, differing by $30,000–$35,000, for the same result. We cannot explain it. This methodology should have been disregarded by the chancellor.

Ignoring this testimony, we still perceive the result figure is excessive. In a fixed fee or quantum meruit case, a result fee should not be disproportionate to the base fee. DR 2–106(B), *supra* lists eight general and several inclusive factors to consider when arriving at the amount to charge a client. The result obtained is but one of those factors. Its prominence in the total fee must bear a reasonable relationship to the time and labor required. An attorney is retained and paid for expending his or her best efforts to secure the best results. Counsel should not be overpaid merely for performing his or her job.

We hold that the result fee of $75,000 in this case does not bear a reasonable relationship to the time and labor required. It is more than one and one-half times the lodestar figure. It no longer serves as a bonus, but instead becomes the primary source of funds for counsel. As the *Kerpelman* Court noted: "[T]he legal profession is a branch of the administration of justice and not a mere money—getting trade." *Id.* at 243, 438 A.2d 501.

### —Fee Arrangement—

While we have concluded that the result may be taken into account in setting fees, not only was the actual fee

---

**8.** See MSBA Committee on Ethics, Op. 79–42 (1979), condemning the use of a result calculation based on a percentage of the property value ultimately acquired.

awarded in this case unreasonable, but the fee arrangement in general is questionable on two grounds.

Appellant asserts the type of fee arrangement here as well is precluded by the decision in *Kerpelman, supra.* In that case the fee arrangement was challenged when at a crucial point in the trial, Kerpelman required the client to sign an additional agreement providing that a successful outcome would be considered in establishing the final fee. The Court found that he violated the *Code of Professional Responsibility* in contracting for a fee based strictly on an hourly rate, when he knew he would seek a larger fee, or decided later to extract one. *Id.* at 242, 438 A.2d 501.

■ While we emphasize that the *Kerpelman, supra* case is both factually and ethically distinguishable from the arrangement in the case at bar, we believe that it serves as guidance for this Court in determining what is an acceptable fee-setting arrangement. As stated, Kerpelman's conduct was condemned for "quot[ing] a fee based on an hourly rate ... knowing that he was not going to abide by such an arrangement if the case was won or, having won the case, decided the time was propitious to extract a larger fee than had been agreed upon." (footnote omitted). *Id.* at 242, 438 A.2d 501. We glean from this language the inappropriateness of unilaterally increasing a fee post-facto of the client's understanding. *See also* EC 2–17, *supra.* While there was no agreed contract rate of remuneration in this case, there is no evidence that appellee had been advised that results would be considered in the final fee. We are quick to note that no additional demand was made in this case, but instead after asking for and receiving $50,000 from appellee, counsel turned to the court to set the remainder of the fee. This fact, accompanied with and accomplished by the expert's opinion, indirectly resulted in securing "a larger fee than had been agreed upon." Had appellee agreed prior to the rendition of services by his counsel that he would pay a result fee of $75,000, the

propriety of the fee arrangement would not be questionable. That is not the case, however.

The arrangement is also defective because counsel did not calculate and demand a fee for their total services. Instead, they asked the court to set an appropriate fee. It is our opinion that counsel should have the responsibility of setting his or her own fee. He or she is in the best position to assess the skill, time, labor and effort the case requires, and the value of his or her own services. While a court in retrospect is capable of judging the reasonableness of the fee demanded, counsel is better suited to gauge it in the first instance.

In summation, we hold that the chancellor abused his discretion in awarding $120,000 to appellee. We are remanding this matter to the chancellor to set a proper fee.

JUDGMENT VACATED. COSTS TO BE PAID ½ BY APPELLANT AND ½ BY APPELLEE.