*In re* MARRIAGE OF JOHN MALEC, Petitioner-Appellee, and MICKIE FLANAGAN, Respondent (Jerome N. Zurla, Appellant).

First District (3rd Division)   No. 1—89—0314

Opinion filed October 10, 1990.

274

Gary A. Weintraub, of Chicago, for appellant.

Leland W. Hutchinson, Jr., and Elizabeth D. Sharp, both of Freeborn & Peters, of Chicago, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

This is an appeal of an order of the circuit court denying Jerome Zurla's (Zurla) petition for additional attorney fees.

This case originated as a dissolution of marriage between John Malec (Petitioner) and Mickie Flanagan. Petitioner entered into an agreement with Stuart Litwin (Litwin) to retain the law firm of Litwin, Zurla and Stein (LZ&S) to represent him in the dissolution of his marriage. Litwin required, and petitioner paid, a $15,000 retainer fee. Petitioner was told that the remainder of the fees would be settled, based on performance, at the end of the case. There was no written contract memorializing the agreement.

In June 1986, the LZ&S firm dissolved. Litwin and Zurla entered into an agreement with respect to the dissolution of the partnership which specified how the firm's work in progress, including petitioner's dissolution of marriage case, would be handled, and how post-partnership dissolution fees paid to either Litwin or to Zurla would be divided. Specifically, the agreement provided that Zurla would receive 40% and Litwin would receive 60% of any future fees paid on petitioner's case to either Zurla or to Litwin.

Subsequent to the partnership dissolution, both Zurla and Litwin continued to represent petitioner. In August 1986, at the suggestion of Litwin and Zurla, petitioner hired the firm of Jenner & Block as additional counsel on the case. Thomas Sullivan, William Suriano and other Jenner & Block attorneys were actively involved. In January 1987, petitioner discharged Litwin, but continued to be represented by Zurla and the Jenner & Block attorneys.

Early in 1987, petitioner offered to pay Zurla $1 million if he obtained certain results in his dissolution of marriage. On June 5, 1987, petitioner met with Zurla to discuss the payment of fees. The meeting occurred in Edward Vrdolyak's office; however, Vrdolyak was not present for the discussion. According to petitioner, Zurla demanded a $3 million fee. Petitioner was incensed and stated that the only fee previously promised was the $1 million fee, contingent upon the achievement of certain results. Petitioner stated that he did not owe Zurla $1 million because those contingencies had not been met. Zurla stated that he was only kidding when he suggested that he be paid $3 million.

On the following day, petitioner discharged Zurla as his attorney. Subsequently, petitioner and Zurla attempted to negotiate a settlement on the amount of fees. While a figure of $751,000 was discussed, no agreement was reached, and no additional fees have been paid.

It is undisputed that from the time petitioner began his dissolution action he has paid a total sum of $742,620 in connection with attorney fees, disbursed in the following manner:

(1) $15,000 initial retainer paid to LZ&S in December 1985,

(2) $135,000 additional retainer paid to LZ&S in July 1986,

(3) four additional monthly payments of $15,000 each to Zurla between January and April 1987,

(4) $150,000 paid to Litwin in June 1987,

(5) $105,000 paid on a personal guaranty loan to Harris Bank for Chicago Vote '87, and

(6) $188,810 paid to Jenner & Block.

In Zurla's second amended fee petition, he petitioned the court to award him fees in the amount of $1 million in *quantum meruit* and, alternatively, that the court award him $751,048.75 on a theory of accord and satisfaction. After a hearing, the trial court denied the fee petition and declined to award any additional fees. It is from this denial that Zurla now appeals. For the reasons stated below, we reverse and remand.

This case involves many facts and voluminous records. In the interest of brevity and clarity, relevant facts will be discussed in the body of this opinion as they pertain to the issues presented.

Zurla first contends that the trial court's decision was based on a fundamentally erroneous approach. He argues that the court erroneously credited payments made by petitioner against the $1 million fee. We will address each disputed credit in turn.

THE JENNER & BLOCK PAYMENT

There is no dispute that petitioner independently retained the services of the Jenner & Block attorneys. Zurla argues that the trial court erroneously credited him with the $188,810 payment which petitioner made to Jenner & Block. His argument is premised on two points. First, Zurla claims that petitioner, in his closing argument, stated that he was entitled to a credit for all fees paid by him to all of the lawyers in the case. Second, following petitioner's argument, the judge commented specifically that "over $180,000 [had been] paid to other lawyers at the firm of Jenner & Block."

The record reveals that in closing argument, petitioner stated that he had paid $465,000 to or on behalf of Zurla and his partner. He concluded that, including Jenner & Block's fees for this case, his total bill was over $723,000. Petitioner did not request that the Jenner & Block fees be credited against the Zurla bill.

Zurla has cited this court to the record of proceedings wherein the trial court stated its findings. However, we have not been provided with that portion of the record and we therefore decline to attach a meaning to the quoted statements of the court without benefit of considering them in their proper context. Moreover, the comments which Zurla quotes as having been "mentioned by the court" do not indicate to us that the court credited the Jenner & Block fees against him.

■ There is no requirement that the trial court make specific findings regarding fee awards (see *In re Marriage of Kosterka* (1988), 174 Ill. App. 3d 954, 960-61, 529 N.E.2d 12), and we decline to infer, merely from the denial of additional fees, that the court, in fact, credited Zurla with the Jenner & Block fees. That notwithstanding, we do agree with Zurla that any such credit would have been error. Thus, on remand, if the court did erroneously credit the Jenner & Block fees, it should make the necessary adjustment.

THE LITWIN PAYMENT

In January 1987, petitioner discharged Litwin as his divorce attorney. In a letter addressed to Litwin at "Litwin, Zurla & Stein," petitioner stated that he had been dissatisfied with Litwin's performance, and noted that he had already paid LZ&S $150,000. Petitioner wrote, "in the hopes that we still may have success and to avoid argument as to whether your efforts may have been partly responsible, I will agree to pay you an additional $150,000 fee upon fulfillment of [specified] conditions." Included in the list of conditions was Litwin's cooperation in transferring all files pertaining to the case, that petitioner

obtain not less than joint custody and 50% time with his children, that the children be ordered to be schooled at the Latin school and that petitioner be able to keep all the stock that was then in his name. Petitioner concluded the letter by stating that he realized that Litwin could not ensure those results without being in the case and invited him to informally contact Zurla or Tom Sullivan from Jenner & Block with his "strategic suggestions, etc."

Petitioner testified that Litwin, from the time he was discharged, continued to work on the case. He described that Litwin transferred all of the files and records, cooperated in briefing some of the medical experts, and cooperated with the Jenner & Block attorneys. In July 1987, one month after petitioner discharged Zurla, he paid Litwin the $150,000. He stated that he paid Litwin the $150,000 because he had "offered it to him and [he] felt the conditions were close enough to be met that [he] would pay him the amount."

Zurla argues that there was no justification for crediting the payment to Litwin against the $1 million fee because petitioner made the payment voluntarily, without being billed or solicited for payment from Litwin.

Petitioner urges that the payment to Litwin was properly credited to Zurla based on principles of agency and partnership law. He argues that at the time this payment was made, the LZ&S partnership, though dissolved, was still in existence. Under the LZ&S partnership dissolution agreement, future fees received on the petitioner's case were to be divided among the partners.

Litwin testified that at the time the partnership dissolution agreement was drawn, he and Zurla anticipated receiving the fees together, and the agreement pertained to fees paid to either of them. However, Zurla took the position that when Litwin was discharged, Zurla was also discharged and then rehired individually by Malec.

In March 1987, Litwin received a document from Zurla which proposed that each of them would keep whatever fees either of them had received or would receive in the future. The document further stated that Litwin would not share in any of the fees that Zurla might receive from petitioner. Zurla's signature was on the document; however, Litwin did not sign it. There has been no agreement to rescind the partnership dissolution agreement.

Petitioner testified that he knew that after he had discharged Litwin, he would have to pay Zurla independently. He also stated that it was his understanding from Litwin and Zurla that all fees paid to either of them would be divided between the two. Petitioner further testified that Zurla continually told him that he was worried about his

obligation to Litwin, that the fees might have to be split, and asked if petitioner would help him to get out of that agreement.

■ Petitioner's testimony concerning the payment of attorney fees created a conflict. Resolution of the conflict and determinations regarding credibility of the witnesses were properly for the trial court. The court, apparently, believed that petitioner had not discharged the partnership and hired Zurla individually.

■ The Uniform Partnership Act provides that the dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business. (Ill. Rev. Stat. 1987, ch. 106½, par. 29; *Horton, Davis & McCaleb v. Howe* (1980), 85 Ill. App. 3d 970, 971, 407 N.E.2d 766.) Upon dissolution, the partnership is not terminated, but rather continues until the winding up of partnership affairs is completed. (Ill. Rev. Stat. 1987, ch. 106½, par. 30.) Therefore, a dissolved partnership has legal existence. *Horton, Davis & McCaleb*, 85 Ill. App. 3d at 972.

We find *Ellerby v. Spiezer* (1985), 138 Ill. App. 3d 77, 485 N.E.2d 413, a case upon which petitioner relies, to be instructive. In *Ellerby* the law partnership dissolved. One of the partners argued that in the partnership contingent fee cases he was handling, the clients had all discharged the partnership and retained him individually after the dissolution. According to him, this entitled him to the entire fees from those cases, less a partnership claim for the reasonable value of services rendered prior to the dissolution. 138 Ill. App. 3d at 81.

The court, in rejecting the partner's argument, stated that the result would be unsound. The court stated that the partner's duty, in regard to the clients that he was handling, was to wind it up and complete it for the partnership. He was not entitled to take any action with respect to the unfinished business leading to purely personal gain, such as having the client discharge the partnership and hire him individually. (138 Ill. App. 3d at 81-82.) The court reasoned that to accept the partner's reasoning would encourage partners of a law partnership facing dissolution to make attempts to convince clients with cases having the most lucrative potential to hire them individually and discharge the partnership. Further, it places the clients of the dissolved law partnership precisely where they should not be placed: in the middle of a dispute among the partners over money. 138 Ill. App. 3d at 82.

Here, the LZ&S partnership had been dissolved; however, there had been no termination. Zurla's duty to the partnership, as was Litwin's, was to wind up the business concerning petitioner's dissolu-

tion case for the partnership. Petitioner's rather cryptic letter to Litwin leaves unclear exactly what role Litwin was to play in the dissolution case. In one breath he is discharged, yet invited to offer strategic suggestions. Nonetheless, if the payment, or any part thereof to Litwin, was in fact for legitimate services he rendered in the dissolution case, the amount actually earned should be credited to the partnership, and likewise to Zurla.

■ We are unable to determine from the record whether, in fact, the payment to Litwin was compensation for his labors in the dissolution case. Therefore, on remand, the court should receive evidence to show what work Litwin actually performed, in the dissolution case in particular, entitling the partnership to the $150,000 payment. Absent proof that the payment, in whole or in part, was for legitimate services rendered in the dissolution case, the payment should not be credited to the partnership or to Zurla.

Before leaving this argument, we address one additional point. In his reply brief, Zurla argues that the partnership dissolution agreement between him and Litwin was erroneously admitted into evidence because petitioner was not a party to that agreement, and he had no standing to enforce its terms. We disagree.

■ Admissibility of evidence is generally left to the discretion of the trial court based upon its probative value and prejudicial effect. (*American Fidelity Fire Insurance Co. v. General Ry. Signal Co.* (1989), 184 Ill. App. 3d 601, 615, 540 N.E.2d 557, citing *Laff v. Chapman Performance Products, Inc.* (1978), 63 Ill. App. 3d 297, 313, 379 N.E.2d 773.) Absent a clear abuse of that discretion, the court's ruling will not be overturned. *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 706, 450 N.E.2d 1199.

■ Here, the dissolution agreement was admitted for the limited purpose of determining whether petitioner should be credited with any payments which had already been made to the partnership, not to enforce the rights between the partners. We believe that the agreement was material to the court's determination of the status of the partnership; whether there were fees due to Zurla, individually and apart from the partnership; and what payments which had been paid to the partnership should have been credited to Zurla. Thus, we find no abuse of discretion in allowing its admission.

THE LOAN GUARANTY PAYMENT

After the partnership dissolution, Zurla began sharing office space in the law offices of Edward Vrdolyak. The record reveals that Zurla consulted with Vrdolyak 70 or 80 times on petitioner's case. Accord-

ing to petitioner, some time prior to the 1987 Chicago mayoral election, Zurla asked him to make a $100,000 donation to Vrdolyak's mayoral campaign. Zurla assured petitioner that the donation would be credited against his attorney fees. Petitioner personally guaranteed a loan from the Harris Bank to Chicago Vote '87. When Chicago Vote '87 defaulted on the loan, petitioner paid both the principal and interest on the note.

Zurla disputes petitioner's version of the facts. According to Zurla, petitioner had agreed to a $1 million fee with certain credits to be applied against that fee. When Sullivan contacted Zurla with the proposed fee settlement, among other credits, petitioner requested that the $100,000 loan to Chicago '87 be credited. Zurla agreed to the credit, but only as a part of the settlement negotiation.

In his brief, Zurla states that petitioner's loan agreement to Chicago Vote '87, as evidenced by the unexecuted fee settlement agreement, was in return for Vrdolyak's legal services. However, according to Vrdolyak, who attended the fee settlement meeting on Zurla's behalf, he was never asked to sign the fee agreement, nor was he aware that his signature was necessary to the settlement of the fee dispute. Vrdolyak consistently testified that the fee was owed to Zurla.

Vrdolyak also testified that he was not affiliated in a partnership or other business association with Zurla. He was aware that Zurla represented petitioner, and occasionally, at petitioner's request, Zurla consulted with him about petitioner's divorce. According to Vrdolyak, petitioner told him that he wanted to help him (Vrdolyak) politically. Vrdolyak suggested that he make a donation to Chicago Vote '87, a nonpartisan, voter registration organization. Vrdolyak stated that he thought that the $100,000 was a direct donation to Chicago Vote '87; he was unaware that the donation was made possible because of a note which had been co-signed by petitioner and Zurla.

We are not persuaded that the loan agreement and its credit toward fees was not the plan of petitioner and Zurla. Further, we do not find, as Zurla suggests, that petitioner's testimony conflicts with Vrdolyak's. Merely because petitioner initiated the discussion about the contribution with Vrdolyak does not mean that the scheme was not previously the brainchild of petitioner and Zurla. Our belief is strengthened by the facts that Vrdolyak never testified that the loan guaranty was in satisfaction of fees owed to him by petitioner. He testified that he was unaware of the form of the contribution and that Zurla co-signed the loan.

The facts concerning this transaction are scant and conflicting, and we are at a loss to understand the motives of the parties in

entering into this loan arrangement. The trial court was faced with the task of deciding which version of the facts was believable. To the extent that the testimony was conflicting, we repeat the old established rule that the credibility of the witnesses is for the trier of fact, who is in the best position to observe witnesses and their demeanor and assess the relative credibility of conflicting testimony on fact issues. (*In re Marriage of Kaplan* (1986), 149 Ill. App. 3d 23, 28, 500 N.E.2d 612; *In re Marriage of Dulyn* (1980), 89 Ill. App. 3d 304, 411 N.E.2d 988.) The trial court's determination may not be disturbed on review unless it is clearly against the manifest weight of the evidence. (*In re Marriage of Ligas* (1982), 110 Ill. App. 3d 1, 6, 441 N.E.2d 1277.) Here, the trial court believed that petitioner and Zurla agreed that the $100,000 loan would be credited against Zurla's fee. We will not substitute our judgment.

Zurla's second contention on appeal is that the trial court failed to consider the relevant factors in determining the reasonableness of his fee. The determination of reasonable attorney fees is a matter within the sound discretion of the trial court. (*Kaiser v. MEPC American Properties, Inc.* (1987), 164 Ill. App. 3d 978, 983, 518 N.E.2d 424.) Absent an abuse of that discretion, its decision will not be disturbed. *Kaiser*, 164 Ill. App. 3d at 984.

In determining the reasonableness of the fee, the trial court's responsibility is not fulfilled merely by inquiring into the number of hours which counsel devoted to the matter. (*Tippet v. Tippet* (1978), 65 Ill. App. 3d 1018, 1021, 383 N.E.2d 13.) The criteria for determining whether fees are reasonable include the skill and standing of the attorneys; the difficulty of the questions in issue; the amount and importance of the subject matter, especially from a family law standpoint; the degree of responsibility involved in the management of the case; the usual and customary charge in the community; and the benefits resulting to the client. (*In re Marriage of Armstrong* (1982), 107 Ill. App. 3d 217, 219, 437 N.E.2d 761.) The most important of these factors is the amount of time necessarily spent on the case. (*In re Marriage of Reczek* (1981), 95 Ill. App. 3d 220, 222, 420 N.E.2d 161.) The fees allowed should be only in such amount as will compensate for the services rendered (*Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 582, 373 N.E.2d 576), and should be fair to both the party required to pay and to the attorney requesting them. (*Gasperini*, 57 Ill. App. 3d at 582.) Finally, the time charged for must have been necessary to handle the matter involved. *Christian v. Christian* (1979), 69 Ill. App. 3d 450, 459, 387 N.E.2d 1254.

Zurla first argues that the court failed to consider the com-

plexity of the case and the fact that petitioner's case precluded him from accepting other clients. In its written order, the court acknowledged that the case involved considerable assets. However, the court concluded that Zurla did not spend much time dealing with difficult issues concerning the assets, but rather, spent most of his time on visitation and custody matters, which did not involve novel or difficult issues.

It appears that the court did consider the complexity of the issues involved, but further determined that Zurla was not responsible for the more complex ones. We have examined the record, including Zurla's compilation of time spent, a statement which designated the responsibilities of the attorneys in the case, and Zurla's other exhibits. Review of Zurla's time compilation reveals that while he devoted some time to the financial aspects of the case, most of the recorded time references visitation, custody, and the marital settlement agreement. Zurla was also responsible for the medical/psychological evidence in the case.

Zurla testified concerning the division of responsibilities. According to him, the Jenner & Block firm was responsible for the research regarding the transfer of stock, and the significance and characterization of those transfers. They were also responsible for discovery work for purposes of taking depositions and back-up trial work.

Because of the contested nature of this case concerning visitation and custody, Zurla was required to devote many hours of his time dealing with that issue. Even the slightest detail required his attention. Dr. Marshall Falk, a psychiatrist, who had been involved in the case, testified that in his experience this case required more than most custody and visitation matters.

However, Zurla is a seasoned matrimonial law attorney with experience in contested and uncontested cases. The fact that this matter was heavily contested and required his constant attention did not necessarily render the issues with which he dealt novel or difficult. We believe that the court gave proper consideration to this factor and that its conclusion was correct.

Concerning the preclusion of taking other cases, Zurla testified that he carried approximately 10 to 15 cases from the partnership, after the dissolution. While working on petitioner's case, which required 80% of his time, he turned down other cases. In a 13-month period, he appeared in court on petitioner's case 130 times, many of those appearances having been on emergency motions. According to him, the agreement with petitioner was that he would handle petitioner's case exclusively.

Vrdolyak testified that petitioner's case took "probably all of [Zurla's] time." Additionally, John DeRose, an attorney who shared office space with Zurla, testified that Zurla referred two dissolution cases to him, and that Zurla was working solely on petitioner's case for the six or seven months that they shared the office space.

In its written order, the trial court stated that there was no evidence presented that Zurla lost any business because of his work on petitioner's case. We disagree. The testimony clearly established that he lost business. Accordingly, the court, on remand, should consider this factor in determining the reasonableness of Zurla's fee. (See 107 Ill. 2d R. 2—106(b)(2).) Zurla next argues that the trial court failed to consider the "results achieved" as a factor in its determination of the reasonableness of the fees. This argument is premised on the court's statement that it "[d]id not believe that either a multiplier or an enhanced fee is ever appropriate in a marital dissolution case." Zurla relies on *In re Marriage of Barry* (1st Dist. 1988), Nos. 86—1908, 86—2206 (unpublished order under Supreme Court Rule 23). In that order, this court stated that the circuit court's determination that the attorney was not entitled to enhancement fees was supported by the evidence. From that language, Zurla concludes that enhancement fees have been approved by this court and are permissible.

As we have stated, the result obtained in a case, along with the various other factors, is a circumstance to be considered as a guide in determining the reasonableness of attorney fees. In order to avoid an irrational fee there must be a correlation between the services performed and the applicable factors. Based on the weight or value assigned to each of the relevant factors, the fee may be adjusted upward or downward. To that extent, the fee may be "enhanced" or decreased.

The key consideration in setting any fee is reasonableness. Thus, any "enhancement" or diminution which is justified by the applicable factors must necessarily be limited by what is reasonable and fair to the parties. We caution that financial ability does not warrant an allowance beyond a fair and reasonable amount. (*Green v. Green* (1976), 41 Ill. App. 3d 154, 170, 354 N.E.2d 661.) While we agree with the court that a multiplier would not be appropriate in a dissolution case (see *Bellow v. Bellow* (1981), 94 Ill. App. 3d 361, 419 N.E.2d 924), we do not agree that fees may not be "enhanced" in consideration of the circumstances involved.

Petitioner then argues that an enhanced fee or one that is based on results achieved is a contingent fee. He maintains that since contingent fee agreements in dissolution cases are void as against public

policy, petitioner should be barred from recovering any fees. *In re Fisher* (1958), 15 Ill. 2d 139, 153, 153 N.E.2d 832; *Stoller v. Onuszko* (1973), 10 Ill. App. 3d 598, 295 N.E.2d 118.

■■ Zurla responds, relying on *Head v. Head* (1986), 66 Md. App. 655, 505 A.2d 868, that since his fee was not based on a percentage of any amount recovered or saved it was not contingent. In *Head*, the court stated that because the result obtained is one of the factors considered in determining the fee, it does not render the fee contingent. (66 Md. App. at 668, 505 A.2d at 876.) In Illinois, the result obtained is also a factor to be considered as a guide in determining the reasonableness of a fee. (107 Ill. 2d R. 2—106(b)(4).) Thus, to the extent that *Head* stands for the proposition that consideration of that factor does not convert the fee into a contingency fee, we agree.

However, while Zurla's fee arrangement would not have been contingent because of the consideration to be given to the results achieved factor, we do believe that it was contingent for another reason.

■■ Canon 2—106 of the Code of Professional Responsibility defines a contingent fee agreement in the following manner:

"[A]ny agreement for the provision of legal services by a lawyer under which the amount of the lawyer's compensation is contingent in whole or in part upon the successful accomplishment (by settlement or litigation) of the subject matter of the agreement, regardless of whether the fee is established by formula or in fixed amount." 107 Ill. 2d R. 2—106(c)(1).

■■ Here, sometime early in 1987, petitioner offered to pay Zurla $1 million if certain, particularized results were obtained. Zurla agreed to the terms of the representation, and he now argues that since those results were achieved, he should be paid the $1 million. Petitioner argues that, since the particularized goals which would trigger his requirement to pay the $1 million never occurred, he was not obligated to pay that amount. We find this agreement to be characteristic of contingent agreements as they are defined in the Code of Professional Responsibility.

Zurla alternately argues that even if the $1 million fee agreement is an illegal contingent fee contract, that should not be a bar to *quantum meruit* recovery. He then directs our attention to other jurisdictions wherein recovery has been allowed.

■■ We are aware that in some jurisdictions contingent fee arrangements in divorce cases do not necessarily render the agreement void and unenforceable. The rationale in those cases is that this form of illegality does not permeate the entire contract. (See *McDearmon*

*v. Gordon & Gremillion* (1969), 247 Ark. 318, 445 S.W.2d 488; *Coons v. Kary* (1968), 263 Cal. App. 2d 650, 69 Cal. Rptr. 712.) In still others, *quantum meruit* recovery has been permitted where the contingent fee arrangement was entered into after the divorce action had already been commenced. (See *Hay v. Erwin* (1966), 244 Or. 488, 419 P.2d 32; *Morfeld v. Andrews* (Wyo. 1978), 579 P.2d 426; *Guenard v. Burke* (1982), 387 Mass. 802, 443 N.E.2d 892.) However, the mere existence of a contrary rule in foreign jurisdictions does not persuade us toward repudiation of so well established a rule as the one here in Illinois.

◼ Zurla then urges us to abandon our holding in *Licciardi v. Collins* (1989), 180 Ill. App. 3d 1051, 536 N.E.2d 840, and further, has cited to several Illinois cases wherein *quantum meruit* recovery has been permitted in illegal fee cases. (*Brush v. City of Carbondale* (1907), 229 Ill. 144, 82 N.E. 252; *Nathan v. Peterson* (1913), 177 Ill. App. 104; *Papineau v. White* (1904), 117 Ill. App. 51.) However, we note that the cases cited involved champertous transactions, not divorce. The underlying policy reasons for the prohibition of those types of agreements is to prevent multitudinous and useless lawsuits as enterprises and speculations. (7 Ill. L. & Prac. Champerty & Maintenance §2 (1954).) However, recovery of fees in those situations is permitted to prevent unjust enrichment.

◼ In *Licciardi*, we held that an illegal contingency fee agreement in a dissolution case bars recovery, even under a theory of *quantum meruit*. We there stated that we believed that the underlying policy behind disallowing contingent fee arrangements in dissolution cases is "so important that, as long as an attorney's services are employed with respect to the division of marital property, the rule bars contingent fees therefor." (*Licciardi*, 180 Ill. App. 3d at 1061; see also *In re Fisher* (1958), 15 Ill. 2d 139.) Our interest in the preservation of the marital relationship is so strong as to outweigh our concerns that the party may have been unjustly enriched.

We decline to depart from our holding in *Licciardi*, and note that the arguments which petitioner now advances in opposition to the rule there were the same issues which were raised by the attorney in *Licciardi* and which we there rejected. Thus, under the rule of *Licciardi*, which is firmly rooted in our public policy and based on our canon of ethics, we conclude that Zurla is precluded, under any theory, from recovering on the $1 million contingency fee agreement.

◼ However, even though we have determined that the $1 million fee agreement was illegal, we see no reason to bar Zurla recovery of any additional fees due him under the fee arrangement which was

originally agreed upon between petitioner and the partnership. The policy against permitting contingent fees in divorce actions is based on a concern that if the attorney has a financial interest in the outcome of the case, reconciliation of the parties will be either deterred or prevented. (*Fisher*, 15 Ill. 2d at 153.) Here, the original agreement for fees was entered into prior to the filing of the petition for dissolution of marriage, and its terms were not conditioned on any particular result in the case. Thus, since the attorneys, at the time they entered into the original fee agreement with petitioner, had no interest in the outcome of the case, the agreement is not tainted by any illegality and Zurla may properly seek to recover fees based on its terms.

■■■ We are unable to determine from the record what consideration the trial court gave to the results achieved in this case. However, any determination which excluded consideration of that factor, based on the belief that to do so would be an improper "enhancement," was error. Therefore, on remand, the court should give proper consideration to the relevant factors, including the results achieved. If, in applying these factors, it is determined that Zurla is entitled to any additional fees, they must, nonetheless, satisfy the reasonableness requirement.

Zurla's third contention is that the court erred in not considering his time records. He argues that the fact that the records were not kept contemporaneously with the services performed should not preclude their consideration in determining the fee award. We agree.

In its written order, the trial court stated that it found that Zurla's time records had not been kept contemporaneously and that they were not accurate. We are unable to determine, based on this finding, whether the court gave any consideration to the time records.

Zurla testified that the compilation of his time was prepared in October, November and December of 1987. The compilation was constructed by using his original time slips, daily diary, court pleadings, transcripts, telephone records which he had obtained from the telephone company, and personal notes. According to him, the entries on the compilation represented all of the hours he had worked in connection with petitioner's case.

■■■ ■ The burden of proving the reasonable value of the services performed clearly rests with the attorney, who must submit to the trial court evidence from which it can make a reasoned decision in accordance with the applicable law. (*Fiorito v. Jones* (1978), 72 Ill. 2d 73, 93, 377 N.E.2d 1019.) The preference that time records be kept contemporaneously with the performance of tasks is based on the rationale that the closer in time that the record is made, the more likely

it is to be accurate. The failure to maintain contemporaneous records of the time spent rendering services greatly increases the difficulty in determining a proper fee. (*Flynn v. Kucharski* (1974), 59 Ill. 2d 61, 67, 319 N.E.2d 1.) However, estimates can properly be considered by the court (see *Van Fleet v. Van Fleet* (1977), 50 Ill. App. 3d 172, 176, 365 N.E.2d 1143), although they are clearly more susceptible to error, and thus more suspect than more properly maintained time records (*Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 585, 373 N.E.2d 576). Nonetheless, it is permissible for an attorney to reconstruct his hours from whatever information is available: date books, office records, court documents, etc. (*Fiorito*, 72 Ill. 2d at 94.) Moreover, proof of time spent can be evidenced not only by time records of the attorney, but also by oral testimony of persons rendering services. See *In re Marriage of Collins* (1987), 154 Ill. App. 3d 655, 660, 506 N.E.2d 1000.

■■■ The trial court should have considered all of the evidence concerning the time factor in order to determine what amount of time Zurla could be permitted to claim for his services. Deficiencies in documentation warrant reduction rather than denial of fees. (See *Action on Smoking & Health v. Civil Aeronautics Board* (D.C. Cir. 1984), 724 F.2d 211, 220.) Zurla's own testimony concerning the time, the claim that this was his only case, along with other documentation, could have cured some of the deficiencies in the compilation.

Petitioner presented expert testimony of James Hayes, a former Chicago police officer and forensic document examiner. Hayes testified that Zurla's daily time slips had not been made contemporaneously with the services performed. Zurla testified to the contrary and maintained that the slips had been, at the least, recorded within two weeks of the time that the task was performed.

Zurla attempted to present testimony to impeach the credibility of the expert. Officer Ben Wieclawek, a detective in the Chicago police department, who was assigned to the personnel department, testified concerning Hayes' personnel file. According to Wieclawek, he had custody of all of the personnel files, the file presented was a true and correct copy of Hayes' personnel file and the file was kept in the ordinary course of business of the police department.

Petitioner objected to the admissibility of the personnel records. He argued that handwritten notes on the file made them untrustworthy. Petitioner maintained that unless there was proof of who had made the handwritten notes and when, the file should be excluded.

■■■ We believe that the file was improperly excluded. Supreme Court Rule 236, the business record exception to the hearsay rule,

provides in pertinent part:

"(a) Any writing or record, whether in the form of any entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. *All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility.*" (Emphasis added.) 107 Ill. 2d R. 236(a).

■■■ Here, Wieclawek testified that the files were kept in the ordinary course of business, and he therefore satisfied the rule for their admissibility. The exclusion of the files based on Wieclawek's lack of knowledge as to who made the handwritten notes thereon is clearly rebutted by the rule. The handwritten notes go only to the weight to be given the file, not its admissibility.

■■■ By our discussion here we intend no relaxation of the requirement that an attorney maintain contemporaneous and detailed time records. In fact, because the time element is so important, it is incumbent upon the attorney to keep detailed time records during the course of the representation. (*Fiorito*, 72 Ill. 2d at 88.) The trial court should not be overly burdened with the task of piecing together fragments of evidence in order to determine what fees are due. An attorney's failure to maintain accurate records is rightfully a factor weighing against the possibility of total recovery of claimed fees.

We distinguish *Kaiser v. MEPC American Properties, Inc.* (1987), 164 Ill. App. 3d 978, a case upon which petitioner relies to preclude consideration of Zurla's compilation. In *Kaiser*, the court found the attorney's fee petition to be inadequate because it lacked sufficient detailed information concerning the nature of and the actual time expended on each of the tasks performed, the identity of who performed them, how they related to the litigation and whether they were necessarily required. There, petitioner's time summary consisted of entries like "file review," "document review," "court appearances," and "status," and listed the amount of time spent on each task. There was no additional explanation or detail. The court held that the descriptions in the petition were too vague and general to satisfy the petitioner's burden to demonstrate its entitlement to compensation.

■■■ Here, Zurla's petition is problematic for reasons other than

vagueness or over generalization. Since Zurla was the only attorney involved in petitioner's case, there was no question as to who performed the identified tasks. While some entries contain more detail than others, we believe there is sufficient detail for the document to be useful in proving the time necessarily spent on petitioner's case.

Zurla's fourth contention is that the trial court erred in finding that there was no evidence offered to support his hourly rate. We agree.

Zurla testified that his highest hourly rate was $275, with no distinction between rates charged for court time and office time. It was David Grund's, one of Zurla's experts, belief that a reasonable hourly rate would be $275 an hour with the multiplier applied as an enhancer. Donald Schiller, another Zurla expert, stated that his minimum hourly rate was $225 per hour for non-court time and $275 for court time.

The trial court is not required to accept the attorney's opinion of what is a reasonable fee. (*Bellow*, 94 Ill. App. 3d at 376.) It may rely on its own knowledge which it has acquired in the discharge of professional duties to value legal services rendered. (*Richheimer v. Richheimer* (1965), 59 Ill. App. 2d 354, 365, 208 N.E.2d 346.) However, attorneys are entitled to recover a fee based on what is usually and customarily charged and paid for like services in the court where the services are rendered. See *Crane v. Village of Roselle* (1910), 157 Ill. App. 595, 598.

Here, in addition to Zurla's statement of what his rates are, the court heard the testimony of two experts who stated what they customarily charged in similar cases. The court's finding that there was no evidence to support Zurla's hourly rate was error. Based on the evidence presented, and in the trial judge's considered judgment, the trial court should determine a reasonable hourly rate of compensation.

Zurla posits an additional argument on the issue of rates. He asserts that the trial court's conclusion that there should be separate rates for office time and for court time has not been addressed by the Illinois Supreme Court.

While we have not found a supreme court case which addresses this issue, other Illinois case law is clear that when fees are granted in dissolution cases, it is based upon a separate hourly rate for court time and office time. (*E.g.*, *Christian*, 69 Ill. App. 3d 450.) The court time rate is higher in recognition of the greater skill required. (*Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 603, 400 N.E.2d 56.) In *Donnelley*, the court found that the fact that there had

been no distinction between court time and out-of-court time resulted in charging the client the same rate for obtaining simple motions as was charged for the analysis of financial documents. The court required that a distinction be made. (80 Ill. App. 3d at 603. See also *In re Marriage of Kruse* (1980), 92 Ill. App. 3d 335, 337-38, 416 N.E.2d 40 (court held that hours billed as court time should not have been since the work did not require courtroom skills); *In re Marriage of Dulyn* (1980), 89 Ill. App. 3d 304, 411 N.E.2d 988.) We are in agreement with and follow those cases cited herein.

Zurla's fifth and final contention on appeal is that he should be permitted to recover $751,048.75 of the $1 million fee based on a theory of accord and satisfaction.

According to Zurla, petitioner verbally agreed to pay the sum of $751,048.75 to settle the fee dispute. The settlement amount was based on certain credits against the $1 million fee. A draft agreement of the settlement terms was drafted by Sullivan and presented for the signatures of the parties. The draft fee agreement was conditioned on the promises of Zurla and Vrdolyak not to disclose certain facts pertaining to petitioner's dissolution case and business. Violation of the nondisclosure provision would result in liquidated damages. Zurla maintains that despite the fact that the agreement was never executed, there was an accord and satisfaction and that the nondisclosure provision was nothing more than what he was obligated to do under the Code of Professional Responsibility.

Zurla further testified that he agreed to sign the agreement but that Vrdolyak refused to do so, and that petitioner would not sign it unless Vrdolyak did so. The testimony of Vrdolyak was that he was not aware that he was to be a party to the agreement.

■ Our determination that Zurla may recover any reasonable fees obviates the need for us to consider his accord and satisfaction argument. However, we give the argument brief attention. In order to show an "accord and satisfaction," there must be a *bona fide* dispute, the sum in dispute must be unliquidated, there must be a meeting of the minds with intent to compromise, and accord must be executed. *Koretz v. All American Life & Casualty Co.* (1968), 102 Ill. App. 2d 197, 201, 243 N.E.2d 586.

■ There was no accord and satisfaction here. First, there was apparently no meeting of the minds. Petitioner intended that Vrdolyak's promise of nondisclosure would be a part of the agreement. However, Vrdolyak had no knowledge that he was even to be included in the settlement agreement. Additionally, the agreement was never signed. While the parties negotiated on the terms of the settlement,

there was neither mutual assent nor execution of the agreement. Finally, there was no tender of the agreed-upon amount.

It is apparent to us that Zurla expended a great deal of time in his representation of petitioner. We find that the trial court failed to give due consideration to all of the necessary factors in determining whether Zurla was entitled to additional fees. Therefore, on remand the court should give careful consideration to the time factor, as well as to those other factors discussed herein, and consistent with this opinion, the court should determine a reasonable fee for necessary services rendered, applying, as credits against any award, those payments which have been discussed here.

For the foregoing reasons, we reverse and remand to the circuit court.

Reversed and remanded.

CERDA, P.J., and WHITE, J., concur.